MARCIE J. DAVIDSON, APPELLANT, V.
LESLIE O. DAVIDSON, APPELLEE.

576 N.W. 2d 779

Filed April 3, 1998.   No. S-96-696.

James H. Hoppe for appellant.

Terrance A. Poppe and Joseph E. Dalton, of Morrow, Poppe, Otte, Watermeier & Phillips, P.C., for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

PER CURIAM.

On June 3, 1996, the district court for Lancaster County entered a decree dissolving the marriage of Leslie O. Davidson and Marcie J. Davidson. In connection with the dissolution decree, the district court awarded the father custody of the parties' five children. The mother appealed to the Nebraska Court

of Appeals, claiming that the district court abused its discretion in granting the father custody of the children. The Court of Appeals agreed with the mother and, thus, reversed the district court's judgment. *Davidson v. Davidson*, 97 NCA No. 14, case No. A-96-696 (not designated for permanent publication). The Court of Appeals further found that the mother is a fit and proper person to be awarded custody of the children and that it is in the best interests of the children that the mother be awarded such. We granted the father's petition for further review in order to determine whether the Court of Appeals applied the correct standard of review in substituting its judgment for that of the district court in this custody dispute.

## FACTS

In 1984, the mother and the father began living together, and they were married on July 18, 1992. They have five children: David, born December 15, 1984; Richard, born June 28, 1990; Kyle, born November 1, 1991; Mark, born February 13, 1995; and Brianna, born February 19, 1996. Brianna was only 3 months old and still in the hospital at the time of the trial, as she was born prematurely. Brianna's twin sister, Britany, died shortly after birth. Since her release from the hospital, Brianna has needed to be raised in a smoke-free environment, and the evidence reveals that she may have other special needs.

The father works at Davidson Welding, working 4 days a week on 10-hour shifts and earning approximately $2,000 per month. If the father receives custody of the children, due to his job he has hired Bridget Warne, a currently unlicensed day-care provider, to babysit the children along with her own three children. The mother has not worked outside the home since November 1995, and when not working, she is primarily responsible for the care of the children.

In approximately July 1995, the mother and the father separated. Despite the separation and a protection order, the father stayed at the house with the mother from January through April 1996. The mother initially asked the father to stay in the family home in a separate bedroom because she was pregnant and required bed rest. The father testified that during that time period, he was responsible for almost all of the household

chores. The mother asked the father to leave in late March or early April, but the father told her that if she really wanted him out of the house, she could call the police. On April 21, the father did move out of the house after an altercation in which both the father and the mother were cited for domestic assault on each other. The mother has had one other assault citation.

With regard to the father's arrest history, between August 1984 and April 1996, he was arrested for third degree assault, violation of a protection order, child abuse (arising out of an incident in which the father left the children unattended in a car), possession of marijuana and drug paraphernalia, driving with a suspended license, and resisting arrest. Despite the many arrests, the father has been found guilty only of possession of marijuana and drug paraphernalia, driving with a suspended license, and resisting arrest. The father testified that since receiving his last marijuana citation in November 1995, he has not used marijuana. However, David testified that he has seen his father use marijuana since November 1995, but not in the 3 to 4 months prior to trial.

Because the mother had noticed prior to trial that the children were misbehaving, she thought therapy was necessary and, therefore, arranged for family therapy at Lincoln General Hospital to assist the children in dealing with the divorce and the death of their sister. In addition to their misbehavior, two of the boys had also been absent from school or tardy several times. The mother explained that she kept the children out of school for awhile because she was afraid that the father would go to the school and take them away from her.

David's fifth grade teacher testified that David is an average student in her subject areas, but that she has had to spend extra time with him to help him remain caught up in other subject areas because he tells her he does not have time to do his homework. The teacher thinks that David is not adequately prepared for school because David tells her that he has a lot of responsibilities at home. The mother admitted that David has been responsible for getting himself, the mother, and Richard up in the morning and for getting breakfast ready for himself and Richard. Although neither the father nor the mother has attended parent-teacher conferences for David, the father had

visited with the fifth grade teacher several times about David's progress and had come to school to observe David.

Richard's kindergarten teacher testified that Richard is struggling academically and developmentally and that he needs another year of kindergarten. The kindergarten teacher believes that things would be more stable for Richard if the father had custody of him. As such, the kindergarten teacher testified that if the father was to obtain custody, Richard would not need to be in school full time and would be able to repeat kindergarten as he needs to do. On the other hand, the kindergarten teacher stated that if custody was placed with the mother, the school intends to pass Richard into the first grade where he would be in school full time, allowing the school to provide Richard with a stable environment, an environment that would not be provided by his mother. Finally, the kindergarten teacher testified that unlike the mother, the father is an attentive parent and has Richard's best interests at heart.

Marilyn Rhoades, the maternal grandmother, who sees the mother and the children quite frequently, testified that she has observed the mother helping the children with their schoolwork, but has never seen the father doing the same. In addition, she testified that during the summer of 1995, the father called her and told her that she had better come and watch the children because he was leaving and, in fact, was gone when she arrived. Rhoades testified that in another incident 5 weeks before trial, the father was at her house, was very "agitated," and would not leave when asked to do so.

Rhoades also testified, as corroborated by the mother, that the father was verbally and physically abusive toward the mother. The father admitted that on July 3, 1995, he "unintentionally" injured the mother, causing her to receive a whiplash injury. After this incident, the mother testified that she stopped having sexual contact with the father but that on one afternoon, the father held her down and "took what I said no to." Subsequently, the mother discovered that she was pregnant with twins.

The father denied sexually assaulting the mother; however, in a letter to the mother, the father stated, "I will always be proud to call are [sic] children are [sic] children and fill [sic] good even if it was wrong." When asked at trial what he meant by

"wrong," the father answered, "Because we were going through a divorce and having hard times." The mother had talked to the police about the sexual assault, but she decided not to formally report the assault because she "didn't want to have to go through it because to prove that a husband raped a wife is probably pretty hard. And I did become pregnant and — with twins and I just wanted him gone out of my life."

Besides evidence of the father's abusive behavior, there was also evidence that the father used inappropriate disciplinary techniques. Although the father testified that he disciplines the children by placing them in "timeouts," occasionally giving them a "swat on the bottom," talking to them, or grounding them, the mother testified that she has seen the father "whip" the children's "butts." David also testified that the father disciplines him by sometimes "slap[ping] me up side of my head but he don't do it in a severe way. He tries to get me to — slaps me up side the head so I start paying attention." Furthermore, as punishment for wetting his pants in May 1995, the father removed Richard's clothes and made him sit naked in the dark on the porch until the mother intervened and brought Richard inside. Just 5 months earlier, Richard had allegedly been sexually assaulted at school and was treated at Rivendell Center for Children and Youth for the side effects of the assault, including wetting his pants. The father admitted that the punishment was inappropriate.

David testified at trial, outside the presence of his parents, that he had gone to his father's attorney's office a few days before trial. David explained the circumstances under which he went to the office as follows:

> Well, I was at my friend's house. My mom said I could go help him pack. My dad came, he knocked on the door and Stacy opened the door and he yelled my name and I came upstairs and go, "What?" And then he said, "Come on." I said, "I can't." He got me by the hand and took me to his truck and then he just took off.

This incident occurred at a time when the mother had temporary custody of the children and not during the father's visitation time.

David testified that his father says bad things about his mother; however, he also testified that his mother had once said bad things about his father. The father admitted that he told David he was going to report the mother for not taking care of the children, that the children might end up in foster care, and that David should not worry because he would visit them every day. In addition, when David was asked, "Who is [the mother's alleged boyfriend]?" David answered, "Um, as mom says, he's a friend but my dad says a boyfriend." When asked, "What's your dad say about [the alleged boyfriend]?" David answered, "He says that my mom goes over there just for, just for sex and that's what may [sic] dad says and my mom says [the alleged boyfriend] gives her a hug when she needs one and sometimes he'll give her a kiss on the cheek."

Betty Lou Ball, a marriage counselor, testified on behalf of the mother. She has witnessed the mother's interacting with Mark, when he was an infant, and described such interaction as "very appropriate, very nurturing, very loving." In addition, she has observed from her office window the mother interacting with the children and stated that the children were under control and acting appropriately.

With regard to evidence adduced at trial demonstrating whether the mother is a fit parent, the father attempted to elicit testimony to suggest that the mother was romantically involved with another man. The mother denied being romantically involved with the man and denied kissing the man in front of the children. However, David testified that he has seen his mother and the man kiss each other on the cheek.

In addition, the mother admitted that "emotionally" she had "not been good" until being put on an antidepressant for post-partum depression for an 8-week course of treatment. The mother also admitted that she had not spent a lot of time at the house since the birth of Brianna. The mother testified that between the time of Brianna's birth and the time of the trial, she has gone to Texas, to the auto races, to a Bob Seger concert, to a Rockin' Fossils concert, and to several tanning sessions.

In order to attend the auto races on a Thursday evening 2 weeks before trial, the mother left the children with a 14-year-

old male who is allegedly a member of a local gang. The mother testified that she returned home after the races at 1:30 a.m.; however, David testified that the 14-year-old babysat until 6:55 a.m. David further testified that he stayed home from school the next day because he was tired and upset with his mother. The mother explained that she allowed David and Richard to take a personal day from school so she could take David to the races with her as she felt David needed to spend time with her.

There was also testimony at the trial from a nurse at the neonatal unit that the father had taken an active role in the care of Brianna and that the mother visited Brianna less frequently than the father during the nurse's shifts. The nurse further testified, as corroborated by the hospital's records, that when the mother went to Texas, she did not leave a phone number where she could be reached and did not call to check on Brianna for at least 24 hours. The mother explained that the father had the telephone number of where to reach her in case of an emergency and that the father was authorized to give consent for medical treatment for Brianna.

The mother admitted that she was unable to spend as much time at the hospital as she would like. The mother explained that she and the other children had the flu and that "you can't go up there when anyone is sick." The mother also explained that she was very busy caring for the other four children and preparing the home for Brianna by painting, shampooing the carpet, and scrubbing the paneling to rid the home of residual nicotine. However, the evidence reveals that the mother did find time to attend several tanning sessions while Brianna was in the hospital. In addition, the mother admitted that she had not been to the hospital during the 4 days before trial, despite the fact the other children were with the father for visitation.

Finally, Larry Knollenburg and Jack Warne both testified that they have known the father for several years, that they have visited the Davidson residence frequently, and that they perceive the father to be the primary caregiver of the children. Both testified that they have seen the mother and the father smoke marijuana. However, both Knollenburg and Warne testified that the last time they saw the mother smoke marijuana was between 6 and 12 months previously. Knollenburg also testified that it had

been quite awhile since he had seen the father smoke marijuana and that he has never seen him smoke marijuana in front of his children. Warne has concerns about the mother's being the custodial parent for the children because he does not believe she can financially provide for them and because "now or when I was over there recently, you know, [the father] would always care for them . . . ."

Based on the evidence adduced at trial, the trial court, in connection with the dissolution decree, awarded the father custody of the parties' five minor children. The court found that the father was a fit and proper person to have the permanent care, custody, and control of the minor children and that it was in the best interests of the children that the father be awarded such. The mother appealed, claiming that the trial court abused its discretion in awarding the father custody of the children. Agreeing with the mother, the Court of Appeals reversed the district court's judgment and found that the mother is a fit and proper person to be awarded custody of the children and that it is in the best interests of the children that the mother be awarded such. The father successfully petitioned this court for further review.

## ASSIGNMENTS OF ERROR

The father assigns that the Court of Appeals erred in finding that the district court's decision granting the father custody of the children was an abuse of discretion and in awarding the mother custody of the children.

## ANALYSIS

### STANDARD OF REVIEW

In contested custody cases, where material issues of fact are in great dispute, the standard of review and the amount of deference granted to the trial judge, who heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal. Because courts at any level are not capable of mechanical precision in making custody determinations, the following standards of review have evolved for the sake of consistency in applying the rule of law.

In an original divorce action, determinations as to custody in dissolution proceedings are reviewed de novo on the record, but such determinations are initially entrusted to the discretion of the trial judge and will be affirmed unless they constitute an abuse of that discretion. *Palmer v. Palmer*, 249 Neb. 814, 545 N.W.2d 751 (1996); *Sullivan v. Sullivan*, 249 Neb. 573, 544 N.W.2d 354 (1996). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Pope v. Pope*, 251 Neb. 773, 559 N.W.2d 192 (1997). Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Sullivan v. Sullivan, supra.*

However, in the instant case, the Court of Appeals decided that because the district court did not explain the basis for its determination that the children's best interests would be served by awarding physical custody of the children to the father, the appropriate standard of review was de novo "without particular deference to the district court merely because it heard the witnesses testify in person." *Davidson v. Davidson*, 97 NCA No. 14 at 52, case No. A-96-696 (not designated for permanent publication). In determining this to be the appropriate standard of review, the Court of Appeals relied on *Parker v. Parker*, 234 Neb. 167, 449 N.W.2d 553 (1989). In *Parker v. Parker*, 234 Neb. at 168, 449 N.W.2d at 554, we held that

> the party seeking modification of a decree of dissolution bears the burden of showing a material change of circumstances affecting the best interests of a child, and, if a finding on that issue is not made in the trial court, the Supreme Court, in its de novo review, may make such finding if the evidence supports it.

Further, in *Parker v. Parker*, we reiterated our holding in *Hicks v. Hicks*, 223 Neb. 189, 388 N.W.2d 510 (1986), where, in a divorce modification proceeding, we stated that when a trial court fails to make a finding of a material change of circumstances, the question then becomes whether upon de novo

review we conclude that the record shows a material change in circumstances.

The Court of Appeals' reliance on *Parker v. Parker, supra,* is misplaced in the present case. The instant cause is an original divorce action wherein the district court made specific findings that the father was a fit and proper person to have the permanent care, custody, and control of the minor children and that it was in the best interests of the children that the father be awarded such. Therefore, the proper standard of appellate review is de novo on the record for an abuse of discretion, rather than reviewing the record de novo without particular deference to the trial court. More specifically, determinations as to custody in dissolution proceedings are reviewed de novo on the record, but such determinations are initially entrusted to the discretion of the trial judge and will be affirmed unless they constitute an abuse of that discretion. *Palmer v. Palmer, supra*; *Sullivan v. Sullivan, supra.*

Although we noted in *Parker v. Parker,* 234 Neb. at 168, 449 N.W.2d at 554, that "[*i*]*f findings are not made,* this court can make little application of our general rule that in our de novo review, we consider, and may give weight to, the fact that the trial court saw and heard the witnesses" (emphasis supplied), the Court of Appeals went too far when it failed to acknowledge the trial court's specific findings of fact in making its custody determination. In contested custody cases, the trial court's ability to hear and observe the witnesses is of great importance not only in making credibility determinations but also in making necessary findings as to the best interests and welfare of the children. With that in mind, we review this dissolution proceeding de novo on the record to determine whether the district court abused its discretion in awarding custody of the minor children to the father.

## DE NOVO REVIEW

When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests. *Von Tersch v. Von Tersch,* 235 Neb. 263, 455 N.W.2d 130 (1990); *Beran v. Beran,* 234 Neb. 296, 450 N.W.2d 688 (1990); *Ritter v.*

*Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990). Neb. Rev. Stat. § 42-364 (Cum. Supp. 1994) mandates that custody of minor children be determined on the basis of their best interests. In determining a child's best interests under § 42-364, courts

"may consider factors such as general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; the child's preferential desire regarding custody if the child is of sufficient age of comprehension regardless of chronological age, and when such child's preference for custody is based on sound reasons; and the general health, welfare, and social behavior of the child."

*Ritter v. Ritter*, 234 Neb. at 211-12, 450 N.W.2d at 211 (quoting *Christen v. Christen*, 228 Neb. 268, 422 N.W.2d 92 (1988)). In addition, § 42-364(2)(d) requires courts to consider credible evidence of abuse inflicted on any family or household member as one of the factors in its custody determination.

The record reveals that both the father and the mother are far from ideal parents. In fact, the respective environments offered by each parent would indicate borderline parental fitness when considering the significant needs of these five children.

When considering the moral fitness, attitude, stability of character, and parental skills and capacity of each parent, the record is replete with evidence of behavior by each parent that obviously caused concern to the trial court. The testimony reveals that while the mother has provided adequate care for the children during their lifetimes, she has oftentimes used poor judgment, and, particularly during the months prior to the divorce, the mother had placed her own immediate gratification before her children's needs. The mother admitted that she had been away from home a great deal since the birth of Brianna. Two Thursdays before trial, the mother left the children with a questionable 14-year-old babysitter in order to attend the auto

races. According to David, the 14-year-old babysat until 6:55 the next morning, and David stayed home from school the next day because he was tired and upset with his mother.

Moreover, David's fifth grade teacher believed that David was not adequately prepared for school because of the significant responsibilities he had assumed at home. Richard's kindergarten teacher testified that Richard is struggling academically and developmentally and that he will need another year of kindergarten. It is the kindergarten teacher's opinion that unlike the mother, the father is an attentive parent and has Richard's best interests at heart.

We now examine the evidence regarding the father's moral fitness, attitude, stability of character, and parenting skills. While there is substantial testimony in the record that the father is a fit parent and attentive to the children's needs, there is testimony that the father has likewise used poor judgment and has used inappropriate disciplinary measures in the past. We are not unconcerned about the evidence in this regard, or about the allegations regarding spousal abuse. We are particularly concerned about the incident when the father placed Richard on the porch naked as a punishment for wetting his pants until the mother intervened and brought Richard inside the house. Although the father acknowledged that the punishment was totally inappropriate in any circumstances, such an incident at least calls into question his parental skills and capacity.

Nonetheless, there is substantial evidence that the father is a fit parent and attentive to the children's needs. Moreover, there was evidence that the father would provide a more stable home environment for the children's educational and emotional needs. It is this type of case, where neither parent can be described as unfit in a legal sense but neither can be described as an ideal parent, that we give particular weight to the fact that the trial court saw and heard the witnesses in making necessary findings as to the best interests and welfare of the children.

Custody determinations are initially entrusted to the discretion of the trial judge and will be affirmed unless they constitute an abuse of that discretion. *Palmer v. Palmer*, 249 Neb. 814, 545 N.W.2d 751 (1996); *Sullivan v. Sullivan*, 249 Neb. 573, 544 N.W.2d 354 (1996). A judicial abuse of discretion requires that

the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Pope v. Pope*, 251 Neb. 773, 559 N.W.2d 192 (1997). Given the standard of review and the nature of the case, we cannot say that the trial court abused its discretion by granting custody of the children to the father.

## CONCLUSION

We therefore reverse the judgment of the Court of Appeals and remand this cause with directions to reinstate the judgment of the district court, which includes the granting of the permanent care, custody, and control of the children to the father.

REVERSED AND REMANDED WITH DIRECTIONS.