744 N.W.2d 243 (2008)
16 Neb. App. 297
Jeffrey L. EDWARDS, appellee and cross-appellant,
v.
Dianna Y. EDWARDS, appellant and cross-appellee.
No. A-06-1350.
Court of Appeals of Nebraska.
January 15, 2008.
*247 Mark J. Milone, of Govier, Milone & Kinney, L.L.P., Omaha, for appellant.
P. Shawn McCann, of Sodoro, Daly & Sodoro, P.C., Omaha, for appellee.
SIEVERS, CARLSON, and CASSEL, Judges.
CASSEL, Judge.

INTRODUCTION
The marriage of Jeffrey L. Edwards and Dianna Y. Edwards was dissolved by a decree of the district court for Douglas County. Dianna appeals, and Jeffrey cross-appeals. On our de novo review, we conclude that the district court did not abuse its discretion in its determinations regarding the division of the marital estate, Jeffrey's motion for temporary relief, a supersedeas bond, attorney fees, and custody of the parties' minor children. We further conclude that a premarital agreement entered into by the parties prior to their marriage is valid and enforceable in its entirety. We affirm the district court's decree as modified.

BACKGROUND
Jeffrey and Dianna met in 1994. At the time of their meeting, Dianna was a registered nurse employed by the University of Nebraska Medical Center. In the summer of 1994, Dianna began working for Jeffrey while continuing her employment with the medical center. In 1995, she earned her bachelor of science degree in nursing.
When the parties met, Jeffrey was a physician and the sole shareholder and practitioner of a professional corporation he formed in 1993. He had additional business interests in a winery and in several assisted living facilities.
Approximately 3 months after they met, Dianna moved into Jeffrey's residence, a house that he purchased in 1990. Shortly thereafter, the parties began contemplating marriage. They married in June 1996.
According to Jeffrey, the parties started discussing a premarital agreement approximately 14 months prior to their wedding. They had continuing discussions on the matter until they executed an agreement on May 21, 1996. Jeffrey testified that both he and Dianna were represented by counsel while they negotiated the terms of the agreement. He testified that several drafts of the agreement were prepared before the parties agreed to the final terms. Jeffrey testified that requests by Dianna's attorney prompted the changes that were made to the original draft. Jeffrey's attorney, the author of the premarital agreement, corroborated Jeffrey's testimony and also testified that Dianna was not pressured into signing the agreement.
Dianna testified that she began preparing for the parties' wedding approximately 9 months before it took place. In preparation for the wedding, she reserved a church and decorations for the church, scheduled the reception, purchased her wedding gown, prepared and mailed wedding invitations, and hired someone to bake the wedding cake. Dianna testified that Jeffrey "brought up" the premarital agreement to her about 2 months prior to the wedding. By that time, she had completed all of the preparations mentioned above and had expended approximately $1,500 in anticipation of the wedding. After Jeffrey presented the first draft of the premarital agreement to her, Dianna hired an attorney and spent approximately 1 hour with her attorney discussing the terms of the agreement.
According to Dianna, on the day the parties executed the agreement, Jeffrey called her from work and instructed her to meet him at his attorney's office. Dianna *248 then called her attorney, who informed her that he no longer wished to represent her. When Dianna arrived at the office of Jeffrey's attorney, she told Jeffrey and his attorney that she no longer had legal representation. According to Dianna, Jeffrey responded, "Well, you don't really need [an attorney] and told her to sign the agreement. Jeffrey also informed her that his attorney was leaving town the following day and would not return until after the wedding. Dianna testified that she protested, but still signed the agreement. Jeffrey does not dispute that Dianna's counsel was not present when the parties signed the agreement.
Dianna testified that she was unaware of Jeffrey's income when she signed the agreement and that she felt "significant pressure" to sign the agreement. She also testified that she was taking antidepressant medication prescribed to her by Jeffrey when she signed the agreement. We will further discuss the circumstances surrounding the execution of the premarital agreement as necessary in the analysis section.
The premarital agreement provides that each party had been fully informed as to the other's assets and property. Indeed, exhibits listing the identity and approximate value of each party's assets are attached to the agreement. Jeffrey showed that at the time the agreement was executed, his total assets were valued at approximately $1,710,299.21. Dianna showed her total assets to be valued at $28,463. Jeffrey did not include his income in his declaration of assets.
The agreement states that in the event of divorce, "neither party shall be entitled to any of the separate property of the other, except as set forth in Paragraph 9 hereinafter." Paragraph 9 states that if the parties divorce, Dianna is entitled to the following property: a family car worth at least $15,000, furniture she brought into the marriage, all of her personal effects, and permanent alimony and a lump-sum payment based upon the duration of the marriage. In the event that children were born to the marriage or either party became disabled, subparagraph E of paragraph 9 contemplates temporary alimony or spousal support but limits it to a period of 6 months.
The parties' marriage produced two children: A.E., born in September 1999, and J.J.E., born in October 2001. On February 12, 2003, Jeffrey petitioned the district court for dissolution of the marriage. He sought custody of the children. Dianna filed a cross-petition seeking custody of the children, spousal support, and exclusive possession of the marital residence. On June 5, the district court issued a temporary order awarding Dianna custody of the children, child support, exclusive possession of the family residence, and alimony.
A 5-day trial commenced on November 22, 2004. A considerable amount of testimony was adduced during the trial. We have considered all of the testimony, but summarize only that which is the most pertinent to the issues presented for our resolution.
Both parties testified and called witnesses to testify regarding their parenting abilities. Jeffrey, who was 47 years old at the time of trial, testified that the marriage to Dianna was his second. His first marriage produced two daughtersMe.E. and Ma.E.and ended in divorce when those children were ages 4 and 3 respectively. Jeffrey was granted sole physical custody of Me.E. and Ma.E. and raised those two girls with the assistance of an in-house nanny. At the time of trial, Me.E. was 21 years old and Ma.E. was 20 years old.
*249 Jeffrey testified that he was still employed by the professional corporation, but that he no longer worked nights or weekends as he had in the past. He testified that if he were awarded custody of A.E. and J.J.E., he intended to hire "a nanny to care for them while he is at work.
Although Jeffrey testified at trial that Dianna is a good provider for A.E. and J.J.E., he also testified extensively about the deficiencies he perceived in Dianna's parenting. He testified that Dianna used inappropriate language in the presence of A.E. and J.J.E. He also testified that Dianna had verbally and physically abused A.E. and J.J.E. However, when pressed to ex plain the alleged physical abuse, he gave the following examples: First, he testified that Dianna allowed her pet dog to lick A.E.'s mouth and did nothing to discourage A.E. from this activity. Second, he testified that Dianna took the children to unnecessary chiropractic appointments. Third, he testified that when he arrived at the marital residence one day during the winter of 2003, he discovered the children alone in a vehicle in the garage. He opined that Dianna left them in the garage after a trip because they fell asleep in the vehicle. Jeffrey further testified that Dianna is an alcoholic. He testified that Dianna had used alcohol in the presence of the children and that on at least one occasion had the children with her while she drove under the influence of alcohol. Jeffrey also testified that Dianna had physically abused Me.E. and Ma.E. in the presence of A.E. and J.J.E.
Jeffrey expressed concern about the condition of the marital residence since his departure upon the parties' separation. Jeffrey testified that he returned to the residence after the separation to inventory some personal items and observed a "foul aroma" that he believed came from animal waste. He testified that after the parties' separation, Dianna had acquired two dogs and two birds. These animals joined two dogs and three cats already living in the home. He testified that he also noticed stains from animal waste throughout the house.
Jeffrey testified that Dianna made decisions about A.E.'s education without consulting him. He explained that Dianna had removed A.E. from the kindergarten to which the parties had agreed to send her without consulting with Jeffrey and eventually enrolled A.E. in preschool. He also testified that Dianna often placed the children in daycare while they were in her custody even though she was not employed outside the home. He testified that during the marriage, Dianna was not at home with the children on a regular basis and frequently used daycare providers even when she was at home. Finally, Jeffrey testified that Dianna lacked financial stability.
Jeffrey called multiple witnesses to testify on his behalf. A longtime friend of Jeffrey's testified that he had observed both Jeffrey and Dianna with their children on many occasions. He testified that when he saw Dianna with the children, she seemed "very aloof, very unattentive to the children," and did not show a lot of affection toward them. He testified that on one occasion, he observed Dianna caring for A.E. while Dianna appeared to be intoxicated.
Ma.E., Jeffrey's daughter, testified that she lived with Jeffrey and Dianna until August 2002, at which time she moved out of the family residence to attend college. Ma.E. testified that she witnessed Dianna consume alcoholic beverages on an almost daily basis when she resided with Jeffrey and Dianna. She testified that she believed Dianna was intoxicated on one occasion when Dianna drove a vehicle in which Ma.E. and A.E. were passengers. She *250 also testified that she believed that on New Year's Day 2003, Dianna drove while intoxicated with J.J.E. in the vehicle. Ma.E. also testified that Dianna hit her while Ma.E. held A.E. during a confrontation between the women. She also testified that she witnessed Dianna assault Me.E. on more than one occasion. She recalled that Dianna assaulted Me.E. and attempted to run Jeffrey over with her car during a family trip in August 2001.
Ma.E. testified that Dianna often did not stay home to care for A.E. and J.J.E. Instead, the children were put in daycare while Dianna engaged in self-gratifying activities. Ma.E. testified that Dianna even hired daycare providers to watch A.E. and J.J.E. at the house while Dianna was present. On cross-examination, Ma.E. admitted that despite the weaknesses she perceived in Dianna's parenting, A.E. and J.J.E. were well socialized, healthy, and appropriately dressed and groomed.
Dianna testified in her own behalf. Dianna was 45 years old at the time of trial. She testified that at all relevant times, she had been the children's primary caregiver and had been primarily responsible for the children's hygiene, health, and day-to-day needs. She testified that she disciplines the children. She testified that she stopped working during the parties' marriage in order to care for the children on a full-time basis. She testified that she supervises the children at extracurricular activities. She also testified that she takes the children to church and teaches Sunday school.
Dianna admitted that some of the testimony given on Jeffrey's behalf was true. She admitted that she had made decisions regarding A.E.'s education without consulting Jeffrey. She explained that she removed A.E. from kindergarten because A.E. experienced separation anxiety, was young for her class, and was scoring below average. Dianna testified that A.E. performed very well in preschool. She also admitted that A.E. and J.J.E. are placed in daycare on a regular basis. She testified that she exercises while the children are in daycare, but testified that most of the time when they are placed in daycare, she cleans or attends meetings and hearings, presumably related to the divorce.
Dianna also admitted that she has many pets. However, she testified that she discourages A.E. from allowing the dogs to lick her and further testified that she regularly cleans the carpets and sheets in the house. Finally, Dianna admitted that she grabbed Me.E. by the neck during a family trip. She explained that she did not intend to hurt Me.E., but only wanted to get Me.E.'s attention.
Dianna denied much of the remaining testimony against her. She denied trying' to run over Jeffrey with her car. She testified that much of Ma.E.'s testimony was untrue and opined that Ma.E. was motivated to testify against her by Ma.E.'s close relationship with Jeffrey. Dianna denied that she ever drove under the influence while the children were with her and denied ever being intoxicated while caring for the children. She testified that she has never left the children unsupervised.
Dianna's neighbor of 5 years testified that she regularly allows her daughter to spend time with A.E. under Dianna's care. She testified that she regularly sees Dianna with the children at church and that Dianna teaches Sunday school. She testified that Dianna keeps the parties' house "[p]retty tidy, probably better than mine, but kris fine, yeah." She testified that A.E., and J.J.E. interact well with others and are well-groomed children. She testified that she has never seen Dianna consume an alcoholic beverage and has never thought that Dianna had been drinking while caring for the neighbor's children. *251 She further testified that she has never observed Dianna drive erratically.
Dianna's mother testified that although Dianna is not the "best housekeeper," Dianna keeps the parties' house clean. She testified that she has observed A.E. and J.J.E. in the presence of Dianna's animals and never worries about the children or about their interaction with the animals. She testified that Dianna is a good, nurturing parent and that the children are well disciplined.
Marlys Oestreich, Dianna's psychotherapist, testified that she counseled Dianna from July 2000 to December 2003 for symptoms of depression, anxiety, and alcohol abuse. Oestreich testified that Dianna took medication to treat depression. Oestreich testified that during one counseling session, Dianna disclosed that she had had an altercation with either Me.E. or Ma.E. and that she grabbed one of the girls by the neck. Oestreich testified that Dianna asked her for assistance on how to mend her relationship with Me.E. and Ma.E. after the altercation. Oestreich understood from later sessions that Dianna had made amends with them.
Oestreich testified that she does not see Dianna as an alcoholic. Oestreich testified that she observed Dianna interact with A.E. and J.J.E., that Dianna was appropriate with the children, and that there was no indication that Dianna is an unfit parent; in fact, she opined that Dianna could be a successful parent. Oestreich further testified that after Dianna's final visit, Oestreich made notes indicating that Dianna was doing well, that her depression was under control, and that there were no alcohol concerns. She had also recorded that Dianna was active in life and was maintaining self-care activities.
On June 30, 2005, the court entered a decree dissolving the parties' marriage. The court found that both Jeffrey and Dianna are "fit and proper persons to be awarded the custody of the minor children," but that the best interests of the children would be served by awarding custody to Dianna subject to Jeffrey's reasonable rights of visitation. The court found the premarital agreement valid and enforced it in its entirety, with the exception of subparagraph E of paragraph 9the provision limiting temporary spousal support. Pursuant to the terms of the premarital agreement, the court awarded Dianna alimony in the sum of $1,000 per month for a period of 15 months commencing May 1, as well as a lump-sum payment of $35,000. The court awarded Jeffrey the marital residence. The court found that a piano at issue was marital property and awarded each party one-half of the value of the piano. The court ordered Jeffrey to pay $12,500 of Dianna's attorney fees.
On July 8, 2005, Dianna filed a motion to alter or amend judgment, requesting the court to restore her maiden name. In a separate motion made on the same day, Dianna moved the court for a new trial. After a hearing, the court overruled Dianna's motion for new trial, but did not announce a decision on her motion to alter or amend.
On August 31, 2005, Dianna filed a notice of appeal. This court dismissed Dianna's appeal for lack of jurisdiction, finding it premature because the district court had not rendered a decision on her motion to alter or amend judgment. Upon remand, the district court entered an order overruling Dianna's motion to alter or amend judgment.
Dianna timely appeals. Jeffrey cross-appeals.

ASSIGNMENTS OF ERROR
Dianna assigns that the district court erred hi (1) determining that most of the *252 provisions of the premarital agreement are valid and enforceable, (2) applying the provisions of the premarital agreement and awarding Dianna alimony of $1,000 per month for 15 months in addition to a lump-sum payment of $35,000, (3) dividing the parties' financial accounts and business assets as provided in the premarital agreement, and (4) finding the piano to be marital property and awarding each party one-half of its value.
Jeffrey assigns on cross-appeal that the district court erred in (1) granting Dianna custody of the parties' children, (2) finding that the provision of the premarital agreement limiting temporary spousal support is unenforceable, (3) denying Jeffrey's motion for temporary relief in aid of appeal and not setting a proper supersedeas, and (4) awarding Dianna attorney fees.

STANDARD OF REVIEW
Whether Dianna waived her right to appellate review is a question of law. See Liming v. Liming, 272 Neb. 534, 723 N.W.2d 89 (2006).
An appellate court's review in an action for dissolution of marriage is de novo on the record to determine whether there has been an abuse of discretion by the trial judge. Millatmal v. Millatmal, 272 Neb: 462, 723 N.W.2d 79 (2006). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. Id. In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. Paulsen v. Paulsen, 11 Neb.App. 362, 650 N.W.2d 497 (2002). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. Id.
When the evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See Druba v. Druba, 238 Neb. 279, 470 N.W.2d 176 (1991).

ANALYSIS

Waiver of Appeal.
We first address Jeffrey's argument that Dianna waived her right to appeal by accepting alimony payments after entry of the decree. The record confirms that after entry of the decree, several alimony payments of $1,000 each were electronically transferred from Jeffrey to Dianna through the Nebraska Child Support Payment Center. The parties apparently had established an automatic payment system whereby funds to satisfy Jeffrey's temporary spousal support obligation were automatically transferred from Jeffrey to Dianna. Automatic payments continued after entry of the decree.
The record demonstrates that Dianna attempted to avoid acceptance of these payments. She moved for an order from the district court identifying a location where she could deposit the alimony payments that she had received after entry of the decree. Dianna specifically stated in the motion that she was seeking to avoid accepting the benefits of the decree. The court determined that it lacked jurisdiction to determine whether Dianna had accepted benefits of the decree, but nonetheless entered an order authorizing Dianna to deposit the disputed alimony payments into an interest-bearing account to be held by the clerk of the district court pending appeal. On February 9, 2006, Dianna provided *253 notice that she tendered $10,000 to the clerk of the district court.
As a general rule, a party who accepts the benefits of a decree waives the right to prosecute an appeal from it. See Harte v. Castetter, 38 Neb. 571, 57 N.W. 381 (1894). In Larabee v. Larabee, 128 Neb. 560, 259 N.W. 520 (1935), the Nebraska Supreme Court held that a litigant cannot voluntarily accept payment of that part of a judgment that is in his or her favor and thereafter prosecute an appeal from that part of the judgment against him or her.
One notable exception to the acceptance of benefits rule was recognized by the Nebraska Supreme Court in Kassebaum v. Kassebaum, 178 Neb. 812, 135 N.W.2d 704 (1965). In Liming v. Liming, 272 Neb. 534, 544-45, 723 N.W.2d 89, 97 (2006), the Nebraska Supreme Court further developed the exception, explaining:
[A] spouse who accepts the benefits of a divorce judgment does not waive the right to appellate review under circumstances where the spouse's right to the benefits accepted is conceded by the other spouse, the spouse was entitled as a matter of right to the benefits accepted such that the outcome of the appeal could have no effect on the right to those benefits, or the benefits accepted are pursuant to a severable award which will not be subject to appellate review.
Dianna received $46,000 in temporary alimony paid in sums of $2,000 per month from June 2003 to April 2005. She was awarded $50,000 in permanent alimony under the decree. Jeffrey argues in his cross-appeal that the district court should have enforced the provision in the premarital agreement limiting temporary alimony to 6 months. It is therefore Jeffrey's contention that Dianna should have only received $12,000 in temporary alimony and $50,000 in permanent alimony. Dianna has thus far received $56,000 in temporary and permanent alimony. She received $10,000 of that amount after entry of the decree. Jeffrey does not contest that Dianna was entitled to at least this amount. His challenge is limited to how much alimony Dianna is entitled to in addition to that which she has already received. Jeffrey has essentially conceded that Dianna was entitled to the $10,000 that she received after entry of the decree. Therefore, this case falls within the exception set forth in Liming v. Liming, supra. Dianna did not waive her appellate rights, and this argument lacks merit.

Validity, of Premarital Agreement.
In 1983, the National Conference of Commissioners on Uniform State Laws approved and recommended for enactment in all states the Uniform Premarital Agreement Act (the Uniform Act). In 1994, the Nebraska Legislature adopted a version of the Uniform Act. See 1994 Neb. Laws, L.B. 202. Neb. Rev. Stat §§ 42-1001 to 42-1011 (Reissue 2004) (the Nebraska Act) govern premarital agreements executed on or after July 16, 1994. The Nebraska Act authorizes parties contemplating marriage to contract with respect to matters, not in violation of public policy or in violation of statutes imposing criminal penalties, including the rights and obligations of each party in any property of the other, the disposition of property upon divorce, and the modification or elimination of spousal support. See § 42-1004(1). The enforceability of premarital agreements is governed by § 42-1006, which in relevant part provides:
(1) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
(a) That party did not execute the agreement voluntarily; or

*254 (b) The agreement was unconscionable when it was executed and, before execution of the agreement, that party:
(i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
(ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
(iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.
The party opposing enforcement of a premarital agreement has the burden of proving that the agreement is not enforceable. See § 42-1006(1). See, also, In re Estate of Peterson, 221 Neb. 792, 381 N.W.2d 109 (1986).
Dianna contends that the factors set forth in § 42-1006(1) are present in this case and that therefore, the premarital agreement is unenforceable. We first consider whether Dianna executed the agreement voluntarily. Neither the Uniform Act nor the Nebraska Act defines "voluntarily" and the appellate courts of this state have not addressed the meaning of "voluntarily" in this context. We therefore turn to other sources for guidance.
The term "voluntarily" is defined in Black's Law Dictionary 1605 (8th ed.2004) as "[i]ntentionally; without coercion." Appellate courts in other jurisdictions have considered the meaning of "voluntarily" in the context of premarital agreements. Most notably, the California Supreme Court engaged in an extensive discussion of the meaning of "voluntarily" as used in the Uniform Act in In re Marriage of Bonds, 24 Cal.4th 1, 5 P.3d 815, 99 Cal.Rptr.2d 252 (2000). After reviewing multiple sources, including the record of the proceedings of the National Conference of Commissioners on Uniform State Laws, the California Supreme Court determined that a number of factors are relevant to the issue of voluntariness. The California Supreme Court held that when considering the issue, courts should consider whether the evidence demonstrates coercion or lack of knowledge, and stated that in cases cited by the commissioners, courts have considered factors such as
the coercion that may arise from the proximity of execution of the agreement to the wedding, or from surprise in the presentation of the agreement; the presence or absence of independent counsel or of an opportunity to consult independent counsel; inequality of bargaining powerin some cases indicated by the relative age and sophistication of the parties; whether there was full disclosure of assets; and the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement.
Id. at 18, 5 P.3d at 824-25, 99 Cal.Rptr.2d at 262. The court also stated:
[T]he party seeking to avoid a premarital agreement may prevail by establishing that the agreement was involuntary, and that evidence of lack of capacity, duress, fraud, and undue influence, as demonstrated by a number of factors uniquely probative of coercion in the premarital context, would be relevant in establishing the involuntariness of the agreement.
Id. at 19, 5 P.3d at 825-26, 99 Cal.Rptr.2d at 263-64.
Courts in other jurisdictions have relied upon the California Supreme Court's interpretation of "voluntarily." See, e.g., In re Marriage of Shirilla, 319 Mont. 385, 89 P.3d 1 (2004); Sheshunolf v. Sheshunoff 172, S.W.3d 686 (Tex.App.2005). We likewise *255 find its interpretation of "voluntarily" instructive and therefore consider the factors set forth above in our discussion.
Dianna argues that her lack of legal representation when she signed the premarital agreement supports a finding that she did not voluntarily execute the agreement. Although the presence or absence of independent counsel is a factor set forth in In re Marriage of Bonds, supra, this factor is not determinative of whether a party has voluntarily entered into a premarital agreement. See Matter of Estate of Lutz, 563 N.W.2d 90 (N.D.1997). The fact that Dianna was not represented by counsel when she signed the agreement gives only minimal support to Dianna's argument in light of the circumstances surrounding the execution of the agreement. We give this factor little weight because Dianna was represented by counsel while the terms of the agreement were negotiated and until immediately prior to the execution of the agreement. She met with counsel and had the opportunity to ask questions about the agreement. The original draft was altered at the request of Dianna's attorney. In addition, there were several weeks between the time Dianna found out that her attorney had withdrawn and the wedding. During this time, she could have sought additional legal advice.
Dianna also asserts that she was coerced into signing the agreement. She argues that if she had refused to sign the agreement, "she would have been left without a home and a relationship with Jeffrey's two young children for whom she then had been the caretaker for a period of over a year" and her "professional life also would have been destroyed." Brief for appellant at 13-14. She also asserts that she felt coerced because many preparations had been made for the wedding by the time Jeffrey asked her to sign the, agreement and Jeffrey was treating her for depression when she signed the agreement.
While there was testimony that Jeffrey would not marry Dianna unless she signed the agreement, there is no evidence to support Dianna's contention that if she did not sign the agreement, Jeffrey would terminate her employment and make her leave his home. With regard to her depression, Dianna gave no reason why she could not get her medication from another physician and did not adduce any evidence that this factor influenced her decision to sign the agreement. Finally, because there were several weeks between the execution of the agreement and the parties' wedding, we do not believe that the proximity of these two events placed undue duress or coercion on Dianna.
Finally, Dianna cites to Jeffrey's superior business knowledge. At the relevant times, Jeffrey was a physician employed by, and the' sole shareholder of, a professional corporation providing medical services. When the parties executed the agreement, Jeffrey also owned shares in several other businesses, including assisted living facilities and a winery. He also served as a medical advisor for three clinics. Shortly before the parties signed the agreement, Jeffrey had assets valued at over $1.7 million.
Dianna's assets and business experience were considerably less. She disclosed assets valued at approximately $28,000 before she signed the premarital agreement. In 1996, she made approximately $50,000. She was not a business owner and was employed by Jeffrey. While these factors lead us to conclude that Dianna's business experience was less than Jeffrey's, they do not persuade us that Dianna lacked the knowledge necessary to make a voluntary decision regarding the agreement. Dianna was an educated individual who was assisted by an attorney in the negotiation process. *256 The record reveals that the parties' marriage was Dianna's second. Her first marriage ended in divorce. She therefore had some experience with the process of divorce and the possibility of an award of spousal support upon a divorce. Further, the terms and conditions of the premarital agreement were set forth in a straightforward and clear manner. The agreement states that Dianna fully understood the agreement and its covenants prior to signing the agreement. The agreement also states, "The parties hereto acknowledge that they execute this Agreement as their free and voluntary act and that they are not under any constraint or not executing same based upon any coercion or undue influence."
In addition to Dianna's specific assertions, we have also considered whether any of the other factors set forth in In re Marriage of Bonds, 24 Cal.4th 1, 99 Cal. Rptr.2d 252, 5 P.3d 815 (2000), require a finding that Dianna's entry into the agreement was involuntary. We conclude that they do not. We therefore proceed to Dianna's argument that the agreement was unconscionable when it was executed. The issue of unconscionability of a premarital agreement is a question of law. See § 42-1006(3). Dianna's sole support for this argument is that because the district court determined that subparagraph E of paragraph 9 was unconscionable, "it stands to reason the entire document is therefore unconscionable." Brief for appellant at 20. We discuss the trial court's holding regarding subparagraph E of paragraph 9 later in our analysis.
Dianna's argument is illogical and unsupported by law. The provisions of § 42-1006 do not in any way suggest that if any part of a premarital, agreement is unconscionable, the entire agreement is unenforceable. Case law has made it clear that contract provisions may be severable. See, e.g., Gaspar v. Flott, 209 Neb. 260, 307 N.W.2d 500 (1981). Whether a contract is entire or several is a question of intentions apparent in the instrument. Id.
The parties made their intentions clear. A provision in the agreement specifically states, "The covenants and agreements contained in this Agreement ... are intended to be separate and divisible." It further states that if any of the agreement's provisions are found in violation of law, such provisions "shall be ... of no effect to the extent of such declaration of invalidity, and this provision shall be deemed separable from the other provisions of this Agreement, which other provisions shall continue in full force and effect." The provision deemed unconscionable by the district court was severable from the other provisions of the agreement; Dianna's argument is without merit regardless of our decision regarding subparagraph E of paragraph 9.
Because we conclude that the agreement was not unconscionable when it was executed, it is unnecessary for us to discuss whether Dianna was provided fair and reasonable disclosure of Jeffrey's assets, as this factor alone is not sufficient to make the agreement unenforceable. See § 42-1006(1)(b). It is also unnecessary, in light of our conclusions in this section, for us to discuss Dianna's second and third assignments of error. See Kelly v. Kelly, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court is not obligated to engage in analysis which is not needed to adjudicate case and controversy before it). We therefore turn to Dianna's final assignment of error. Piano as Marital Property.

The district court found the piano at issue to be marital property and awarded each party one-half of the piano's $20,000 value. Dianna contends that the piano was her separate property and that she *257 should have been awarded its entire value. Her argument relies upon a provision in the parties' premarital agreement that states that there is a presumption that all property acquired by either spouse subsequently to the marriage is nonmarital. We also notice a provision in the agreement reserving the parties' right to own property jointly.
Jeffrey and Dianna gave conflicting testimony as to which party financed the piano. Each testified that he or she alone paid for the piano. Upon our de novo review, we give weight to the district court's finding that the piano was marital property. Implicit in this finding is that neither party individually purchased the piano, but that they purchased the piano together. This finding is supported by the evidence. Dianna's argument lacks merit. We now direct our attention to Jeffrey's assigned errors.

Limitation of Temporary Support.
The district court determined that the premarital agreement is valid and enforceable, with the exception of subparagraph E of paragraph 9, which subparagraph provides:
In the event that [Jeffrey] and [Dianna] have a child or children from said marriage... the custodial parent . . . shall be entitled to such amounts of temporary alimony or spousal support as is [sic] awarded by a Court having jurisdiction over the parties for a period not exceeding six (6) months. After said six (6) month period, the above [sliding-scale alimony award] is the maximum that said [Dianna] shall receive.
(Emphasis omitted.) The district court found that subparagraph E of paragraph 9 "violates the intent and purpose of statutory provisions regarding an award of temporary support in a dissolution matter." The court further found that enforcement of this provision would be inequitable and unconscionable.
Pursuant to the premarital agreement, the district court awarded Dianna $50,000 in permanent alimony. Jeffrey was ordered to pay Dianna $1,000 per month for 15 months commencing May 1, 2005, and a lump sum of $35,000. These payments were in addition to the $46,000 of temporary alimony Dianna had already received in monthly installments of $2,000 from June 2003 to April 2005.
Jeffrey contends that subparagraph E of paragraph 9 should have been enforced in full and that therefore, Dianna should have only received temporary alimony for 6 monthsfrom June to November 2003at $2,000 per month, for a total of $12,000. Thereafter, his obligation should have been $1,000 per month for 15 monthsfrom December 2003 to February 2005in addition to the lump-sum payment of $35,000. According to Jeffrey, the total awarded Dianna for both temporary and permanent alimony should have been $62,000 instead of $96,000.
The resolution of this assignment turns upon the interplay between § 42-1004(1) and Neb.Rev.Stat. § 42-357 (Reissue 2004). Section 42-1004(1), in relevant part, states: "Parties to a premarital agreement may contract with respect to:... (d) The modification or elimination of spousal support . . . and (h) Any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty." Section 42-357, in relevant part, states: "The court may order either party to pay. . . a sum of money for the temporary support and maintenance of the other party and minor children if any are affected by the action and to enable such party to prosecute or defend the action."
*258 The meaning of a statute is a question of law. In re Estate of Nemetz, 273 Neb. 918, 735 N.W.2d 363 (2007). An appellate court decides a question of law independently of the conclusion reached by the trial court. Malena v. Marriott International, 264 Neb. 759, 651 N.W.2d 850 (2002). Absent anything to the contrary, statutory language is to be given its plain and ordinary meaning. Geddes v. York County, 273 Neb. 271, 729 N.W.2d 661 (2007).
Section 42-1004(1)(d) grants parties the right to contract with respect to the modification or elimination of spousal support. Section 42-1004(1)(d) does not limit its reach to only permanent spousal support. If it was the intent of the Legislature to allow parties to eliminate only permanent spousal support, it could have easily included a modifier in the statute. Because the Legislature did not do this, we recognize that § 42-1004(1)(d) applies to both permanent and temporary spousal support. See Pepitone v. Winn, 272 Neb. 443, 449:, 722 N.W.2d 710, 714 (2006) ("[t]hat which is implied in a statute is as much a part of it as that which is expressed").
We agree with Jeffrey that the district court erred in holding that subparagraph E of paragraph 9 violates the intent and purpose of statutory provisions regarding an award of temporary support in a dissolution matter. We find no conflict between the two relevant statutory provisions. While § 42-357 allows the court to enter an order for temporary support of a spouse and § 42-1004(1)(d) allows the parties to contractually eliminate spousal support, § 42-357 also empowers the district court to require a party to pay sums of money to enable the other party to prosecute or defend against the action. The. Nebraska Act does not allow parties to contract away the court's authority to require such payments. Thus, despite the existence of a premarital agreement limiting the amount or duration of temporary spousal support, a trial court retains the ability to order payment of moneys necessary to enable the party to maintain or defend against the action. The district court made no finding that temporary payments beyond those specified in the premarital agreement were necessary to allow Dianna to defend against the action.
Even if we assume that such a conflict existed, the rule giving preference to a specific statute over a general statute resolves the conflict. To the extent that there is conflict between two statutes on the same subject, the specific statute controls over the general statute. Soto v. State, 269 Neb. 337, 693 N.W.2d 491 (2005). The Nebraska Act specifically permits parties to a premarital agreement to contract for "modification or elimination of spousal support." § 42-1004(1)(d). Regarding the issue we confront, § 42-1004(1)(d) is the more specific statute. We hold that subparagraph E of paragraph 9 is valid under § 42-1004(1)(d). We therefore modify the district court's decree on this issue.

Supersedeas Bond and Temporary Relief in Aid of Appeal Process.
After Dianna filed her second notice of appeal, both parties moved the district court for an order providing temporary relief pending appeal and an order setting supersedeas. Both parties requested possession of the marital residence pending appeal.
The court held a hearing on the motions. During the hearing, the court granted Dianna continued possession of the marital residence pending appeal. In support of its decision, the court stated, "We've got an appeal and a cross appeal. Custody is one of the issues. I'm not going to uproot the kids and I'm not going *259 to move anybody out until the. Court of Appeals makes a decision on what they're [sic] going to do." The court set supersedeas at $5,000 and stated, "[Dianna] does need to pay the expenses and that includes the homeowner's insurance on the property." According to Jeffrey's brief, the court entered a written order memorializing its oral pronouncements, but we do not have that order in our record.
First, Jeffrey assigns that the district court erred in not granting him possession of the marital residence pending appeal. Under Neb.Rev.Stat. § 42-351(2) (Reissue 2004), the district court had jurisdiction while this appeal was pending to "provide for such orders . . . shown to be necessary to allow the use of property . . . or other appropriate orders in aid of the appeal process." The reasons provided by the district court for allowing Dianna to maintain possession of the residence convince us that the court did not abuse its discretion.
Jeffrey also argues that because the supersedeas bond does not contain the conditions that Dianna pay all rents or damages to the residence that may accrue during the pendency of the appeal and that she will not commit or suffer to be committed any waste upon the residence, the district court erred in not setting a proper supersedeas bond in compliance with Neb.Rev. Stat. § 25-1916(3) (Cum.Supp.2006), He further argues that the supersedeas does not reflect 50 percent of Dianna's net worth when considering the amount of money and property awarded to her under the decree.
The appellate court will not modify the district court's order setting the amount of a supersedeas bond unless it finds the district court abused its discretion. World Radio Lab. v. Coopers & Lybrand, 2 Neb.App. 747, 514 N.W.2d 351 (1994). The exercise by the trial court of its discretion with respect to fixing the terms and conditions of a supersedeas bond will not be interfered with on appeal unless there has been a manifest abuse of discretion or injustice has resulted. Id.
Section 25-1916(3) states that
[w]hen the judgment, decree, or order directs the sale or delivery of possession of real estate, the bond . . . shall be in such sum, not exceeding the lesser of fifty percent of the appellant's net worth or fifty million dollars . . . conditioned that the appellant or appellants will prosecute such appeal without delay, will not during the pendency of such appeal commit or suffer to be committed any waste upon such real estate, and will pay all costs and all rents or damages to such real estate which may accrue during the pendency of such appeal and until the appellee is legally restored thereto.
Jeffrey's argument that the bond should be set aside because it does not reflect 50 percent of Dianna's net worth lacks merit. Contrary to Jeffrey's assertion, § 25-1916(3) does not provide that 50 percent of the appellant's net worth is a minimum amount for a supersedeas bond; this amount is the maximum amount at which bond may be set.
We move to Jeffrey's argument regarding the conditions placed on the bond. The district court orally pronounced the bond and its conditions. Apparently, the court later entered a written order. It is not uncommon for a court to orally announce its decision in general terms and later formalize the decision in a written order and include all statutorily required conditions. The court's written order is not in our record. We are unable to ascertain whether the conditions required by § 25-1916(3) were included in the written order. It is the appellant's duty to present *260 and show by the record that the judgment is erroneous. Buker v. Buker, 205 Neb. 571, 288 N.W.2d 732 (1980). As to this matter, Jeffrey did not do so. We therefore cannot conclude that the district court abused its discretion. This assignment has no merit.

Attorney Fees.
Jeffrey assigns that the district court erred in awarding Dianna $12,500 in attorney fees. In an action for dissolution of marriage, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. Gress v. Gress, 271 Neb. 122, 710 N.W.2d 318 (2006). Upon our de novo review of the record, we find no abuse of discretion in the district court's award of attorney fees.

Custody.
The district court held that both Dianna and Jeffrey are fit and proper persons to be awarded custody of the parties' children, but that "the best interests of the ... children would be served by awarding [Dianna] custody," subject to Jeffrey's reasonable rights of visitation. Jeffrey assigns error to this determination.
In contested custody cases, where material issues of fact are in great dispute, the standard of review and the amount of deference granted to the trial judge, who heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal. Marcovitz v. Rogers, 267 Neb. 456, 675 N.W.2d 132 (2004). Our review of the district court's custody determination is de novo on the record to determine whether the court abused its discretion, and we give weight to the trial court's determination of evidence in conflict. See, Gress v. Gress, supra; Smith-Helstrom v. Yonker, 249 Neb. 449, 544 N.W.2d 93 (1996).
When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests, Gress v. Gress, supra. When both parents are found to be fit, the inquiry for the court is the best interests of the child. See In the instant case, Jeffrey does not challenge the district court's determination that Dianna is a fit parent; Jeffrey argues only that it is in the children's best interests to be placed in his custody.
In determining the best interests of the child, Neb.Rev.Stat. § 42-364(2) (Reissue 2004) provides that such consideration shall include, but not be limited to the following:
(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
(b) The desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning;
(c) The general health, welfare, and social behavior of the minor child; and
(d) Credible evidence of abuse inflicted on any family or household member.
In addition, courts may consider factors such as general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy the educational needs of the *261 child. See Davidson v. Davidson, 254 Neb. 357, 576 N.W.2d 779 (1998).
In Davidson v. Davidson, the district court dissolved the parties' marriage and awarded the father custody of the parties' five children. The mother appealed. On petition for further review, the Nebraska Supreme Court found that both the father and the mother were far from ideal parents. The court stated that while the mother had provided adequate care for the children, she had oftentimes used poor judgment and had placed her own immediate gratification before the children's needs. She had not spent a lot of time with the children since the birth of the parties' fifth child. Regarding the father, the court stated that while there was substantial testimony that the father was a fit parent and attentive to the children's needs, there was testimony that he used poor judgment and had used inappropriate disciplinary measures in the past. In addition, the father had a history of abuse and drug use. He had been arrested for child abuse for leaving the children unattended in a car, and there was testimony that he abused the mother.
In its analysis, the court stated that it was not unconcerned about evidence calling into question the father's parental skills and capacity or about the allegations regarding spousal abuse. Nonetheless, the court found:
[T]here is substantial evidence that the father is a fit parent and attentive to the children's needs. Moreover, there was evidence that the father would provide a more stable home environment for the children's educational and emotional needs. It is this type of case, where neither parent can be described as unfit in a legal sense but neither can be described as an ideal parent, that we give particular weight to the fact that the trial court saw and heard the witnesses in making necessary findings as to the best interests and welfare of the children.
Id. at 369, 576 N.W.2d at 786. The court concluded that the trial court did not abuse its discretion in granting custody of the children to the father.
The instant case is similar to Davidson v. Davidson, supra, in that much of the testimony is conflicting and the parenting skills of the custodial parent, Dianna, have been called into question.
At trial, Jeffrey presented Dianna in a negative light. Some of the most disturbing testimony regarding Dianna's parental skills was that she had driven while intoxicated with the children in the vehicle and that she had been intoxicated while caring for the children. Dianna disputed this testimony. We infer from its decision that the district court accepted Dianna's testimony and give weight to the district court's decision to accept Dianna's testimony.
We also recognize that the district court's decision implicitly favors Dianna's testimony over that of Ma.E. regarding the other matter that is particularly disturbing Ma.E.'s claim that Dianna had abused her and Me.E. while in the presence of A.E. and J.J.E. While this testimony raises concern, that concern is mitigated by other circumstances. First, there is no doubt that Dianna's relationship with Me.E. and Ma.E., her stepdaughters, was strained, at best, during most of the parties' marriage. While there were at least two instances of physical contact between Dianna and her stepdaughters, the behavior did not frequently occur. Second, Dianna sought assistance from her therapist in order to improve her relationship with her stepdaughters. Finally, and most importantly, there was no evidence that these events in any way harmed A.E. or J.J.E. There was no evidence of any effect, harmful or otherwise, that such events had on the children. Me.E. and Ma.E. no *262 longer live with Dianna, and therefore, we can presume that there will be no further incidents between Dianna and her stepdaughters in the presence of A.E. and J.J.E.
There is evidence that Dianna is a fit parent. Oestreich testified that Dianna is appropriate with the children and opined that Dianna could be a successful parent. While Jeffrey has worked long hours and has often been away on trips, Dianna has served as the children's primary caregiver. The children have done well under Dianna's care. There is evidence that the children are well-behaved, socialized, and well-groomed children.
After considering all of the evidence, we conclude that this is a case in which we should give particular weight to the fact that the district court saw and heard the witnesses in making findings as to the best interests and welfare of the children. See Davidson v. Davidson, 254 Neb. 357, 576 N.W.2d 779 (1998). We conclude that the district court did not abuse its discretion in awarding custody of the minor children to Dianna.

CONCLUSION
We conclude that the district court correctly found that the majority of the premarital agreement is valid and enforceable, but erred in finding that the provision limiting temporary support is unenforceable. We also conclude that the district court did not abuse its discretion in dividing the marital estate, denying Jeffrey's motion for temporary relief, setting the supersedeas bond, awarding Dianna attorney fees, and granting Dianna custody of the parties' minor children. We affirm the district court's decree as modified.
AFFIRMED AS MODIFIED.