IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

JAIDE V. JAIDE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CHARISS N. JAIDE, APPELLANT,

V.

JOSHUA L. JAIDE, APPELLEE.

Filed December 5, 2017.    No. A-17-311.

Appeal from the District Court for Webster County: STEPHEN R. ILLINGWORTH, Judge. Affirmed.

Mitchell C. Stehlik, of Lauritsen, Brownell, Brostrom & Stehlik, P.C., L.L.O., for appellant.

Joshua L. Jaide, pro se.

MOORE, Chief Judge, and INBODY and BISHOP Judges.

BISHOP, Judge.

Chariss N. Jaide appeals from the Webster County District Court's decree dissolving her marriage to Joshua L. Jaide. Chariss appeals only the court's determination related to custody of the parties' minor children. Finding no abuse of discretion, we affirm.

### BACKGROUND

Chariss and Joshua were married on July 2, 2011; they have two children: a daughter, Kaylen, and a son, Hunter. Chariss filed for divorce on May 11, 2016, and her complaint indicates she was living in Hastings, Adams County, Nebraska, and Joshua was living in Bladen, Webster County, Nebraska. Chariss filed a motion for temporary custody and child support shortly after filing her complaint.

- 1 -

A hearing on "[t]emporary matters" took place on July 25, 2016. Chariss appeared with counsel; Joshua appeared pro se. The court received Chariss' affidavit, then put Joshua under oath to answer questions. Joshua testified he lived with his parents, along with his girlfriend and one of her children in a 4-bedroom house. He indicated his mother took care of the children while he worked from 7 a.m. until approximately 5 p.m., "like a day care." At that time, the children were ages 6 and 3. Joshua argued he should have temporary custody because "the kids have grown up in Bladen their whole life[,]" and "it is a safer community." He claimed there would be a number of sex offenders living within one mile of where his children would be living if in Hastings, whereas, there were "zero sex offenders in Bladen." Joshua also indicated he or his mother had provided care of the children since "day one," and since separation, "the kids have been under the house that [Joshua] live[s] in, and [he] has taken complete control of them."

Chariss' affidavit stated she had been the primary caregiver for the children since their oldest child's (Kaylen's) birth until the parties separated in 2015. Since Kaylen had started school at the time of the parties' separation, the children stayed with Joshua and his parents so Kaylen could go to school in Bladen. She and Joshua had "roughly a 50/50 custody" until later in 2015 when Chariss moved to Hastings for further work opportunities. The children stayed with Joshua and his parents. Chariss claimed Joshua's mother "essentially took care of the children for the entirety of the time." And although Joshua "does care for the children," Chariss asserted he did not provide much of the daily care. Chariss indicated she worked 40 hours per week (night shift, 10 p.m. to 5 a.m.) at Casey's General Store in Hastings and lived in a 2-bedroom apartment there with her boyfriend. She alleged she had a babysitter (her aunt) "next door" who could provide daycare if the children were with her. Chariss' affidavit also asserted Joshua refused to allow her to see the children unless she "signed some sort of agreement." (Joshua testified he wanted her to sign an agreement that she would "have the kids back at a certain time and have that notarized.") Chariss was also sworn in and in response to a question from the court, testified her boyfriend did not have a criminal record. She also indicated her suggestion for parenting time was much like Joshua's request for alternating weekends and holidays, although rather than 6 weeks in the summer, she preferred keeping the summer the same schedule but adding one evening a week "to come and visit them."

Before concluding the hearing on temporary matters, the district court stressed to the parties that a "pretty common dynamic among young people getting a divorce" is, "Whoever gets custody thinks they own the kids. They do not. You're both parents of these children. You're to treat each other with respect around these children, not say bad things about each other in front of those children."

A temporary order was entered August 1, 2016, which awarded joint legal custody to the parties, with Joshua having primary physical custody. Chariss was given alternating weekend parenting time, a couple hours one weeknight, and alternating holidays. Chariss was ordered to pay $326 per month for child support, and the parties were ordered to engage in mediation within 60 days of the entry of the temporary order.

Following a pretrial hearing on October 17, 2016, trial took place on November 17. Chariss appeared with counsel; Joshua again appeared pro se. Evidence adduced at trial pertinent to custody (the only issue challenged on appeal) is summarized next.

Chariss testified that until she and Joshua separated in the middle of May 2015, she "normally" took the children to appointments and met with teachers, and Joshua "did a lot of the cooking," while she "did most of the work with the kids." Immediately following separation, Chariss had the children on Wednesdays, Thursdays, and Fridays, and every other weekend, while Joshua had Mondays and Tuesdays and every other weekend. They followed this schedule until Chariss moved to Hastings about 5 months later, or "late 2015." This caused a change in parenting time in that Joshua now added Wednesdays, while Chariss had Thursdays and Fridays. At that time, Kaylen was attending school in Bladen. In March or April 2016, Chariss suggested the children begin attending school in Hastings, but Joshua disagreed. Chariss claimed that after she made this suggestion, Joshua would not allow her parenting time with the children any more. She said she had to wait for the temporary order to see the children again, although Joshua did let the children call her "once a week for a couple minutes." (On cross-examination by Joshua, Chariss clarified that Joshua did offer to allow her to see the children so long as she would sign an agreement stating when she would have the children and when she would have them back to Joshua.)

Chariss was still living in an apartment in Hastings with the same boyfriend by the time of trial. She offered, and the court received without objection, photographs of her 2-bedroom apartment. Her apartment is within 5 blocks of the elementary school Kaylen, a first grader, would attend; Hunter, not yet of school age, would "go to the Headstart." By the time of trial, Chariss had been working at Casey's General Store about 10 months, working 40 hours per week, with "typical hours" of 10 p.m. to 5 a.m. Her options for child care are her boyfriend, and also her aunt, who lives next door. Chariss acknowledged that her boyfriend owns handguns, and that he had carried a handgun when around the children in the past. He no longer carried a handgun when around the children, because according to Chariss, "Josh didn't like the idea of the gun being on [the boyfriend's] leg when the children were around." So she and her boyfriend had a discussion and they decided that "it was better just kept up and away from them." The guns are kept in a locked gun safe in their home. Chariss said Joshua was a hunter, and he had guns and knives when she lived with him and he had them around the children.

Chariss discussed fun activities she did with the children, like going horseback riding, going to the state fair, and going to parks and walking around. "We read a lot at my house. Especially before bedtime. We come up with a lot of games." Chariss testified about daily routines with the children, as well as her use of a "time-out chair" for discipline.

Chariss expressed concern about the "continued primary placement of the children" with Joshua because, "when [Joshua's mother] was around, [she] took care of [the children] mostly." Chariss said Joshua's mother is a "little harsher than [Chariss] would prefer" and "belts" have been "brought into many conversations before." Chariss did not approve of spanking with belts. Chariss also stated, "One of the reasons we had actually moved out of [Joshua's parent's] house and in with [Chariss'] dad one time was because [Joshua's mother] had slapped Kaylen across the face for sticking her tongue out." As for Joshua's parenting, Chariss expressed concern about "not really paying attention as close as he should be," and she had concerns about how frequently alcohol is used in the house. Her concern was not with Joshua's drinking, but with his father's drinking since Joshua lives with his parents.

Chariss also voiced concern about Joshua preventing relationships between the children and her extended family. She indicated there had been "a few times" when the children "were blocked from my family prior to the first court date we had. So since it's happened before, it makes me wonder if it would happen again." She did acknowledge, however, that there had not been any problem in that regard since the temporary order was entered. Chariss also acknowledged that Joshua had followed the parenting time order since it was entered. Chariss said whoever had primary custody should have the children Monday through Friday, with the other parent having alternating weekends and holidays, and then equal time in the summer. (Joshua agreed with this schedule, except for summer, during which, if he had primary custody, Chariss would get 10 weeks and he would get the last 2 weeks, or vice versa if Chariss had primary custody.) As for joint legal custody, Chariss testified she thought they "could work most things out." But if Joshua "has something stuck in his head and he thinks it's a certain way, it is really hard to get any other opinion in there and come up with an alternate plan."

On cross-examination by Joshua, Chariss agreed she had a heart condition which has caused her to black out, and the last episode was "almost a year ago." She takes medication for the condition, but has no restrictions preventing her from driving.

On examination by Chariss' attorney, Joshua testified he had been working at UTLX, a railcar repair facility, in Hastings for about 11 months. He discussed his earnings and the availability of health insurance coverage, which he did provide for the children.

Other witnesses were called to testify on behalf of Chariss. Her father recalled the parties living with him a couple times, once for a couple months, and another time for one-and-a-half months. He also stayed with them in their home, which he had purchased, for about 4 months. He said when the parties were new parents, "[t]hey had learning curves," and he and Joshua's mother provided "insight" on how to raise children. Their division of care was "pretty equal" initially. Chariss' father acknowledged Joshua was "more of a cook" and did most of the cooking, "[e]verybody" got the children up in the morning, and both parties put the children to bed. His primary concern regarding Joshua having the children was that Joshua's mother would do most of the parenting, and it's "[the parties'] jobs to do the parenting."

Chariss' boyfriend testified he and Chariss had been together about 18 or 19 months. He said he got along with her children, and Chariss "[a]bsolutely" takes good care of the children. The boyfriend acknowledged having guns in a safe, and although he had openly carried a gun in the past, he was no longer doing so around the children because Joshua had an issue with it.

Chariss' 21-year-old sister testified she observed Chariss provide most of the care for the children. She spoke about an incident when Kaylen "was little," and she saw Joshua get mad and he "tore out of" the driveway, his car "went up on two wheels, and he had Kaylen in the back seat." The sister claimed that on another occasion, Joshua left alcohol in a glass and "Kaylen did get ahold of it." She did not have concerns about Joshua's consumption of alcohol "because they were pretty much responsible." The sister said the children are always happy with Chariss, "[t]hey're always just content." She said the children "just adore" Chariss' boyfriend. She supported Chariss having the children "most of the time" because "she's always there. She's always been the one to take care of stuff, do the discipline."

Chariss' aunt who lives in Hastings testified Chariss would "[m]ost definitely" be able to handle primary care of the children because "she seems to run the household pretty good." "She bathes them. She feeds them. She does all kinds of things with them. She takes them . . . horseback riding and to pumpkin patches and Kool Aid Days and stuff like that." The aunt's husband also testified and agreed the children should be placed with Chariss because "[s]he's a very loving mother. She cares about the kids tremendously. She thinks of the kids before herself. And I know for a fact there ain't nothing she wouldn't do for them."

Chariss' cousin testified that on weekends when the parties were still together, he would see Chariss with the children, "and Josh would be there hit and miss." He agreed the children should be placed with Chariss because "she would be with the kids at all times."

Joshua also called witnesses to testify on his behalf, including his mother. Joshua's mother had been retired for 5 years, and had lived in her present residence in Bladen for 17 years. Her husband of 25 years had worked for "AGP" for 17 years. Although no date was provided, Joshua's mother recalled Joshua contacting the Webster County Sheriff's Office after Kaylen came home from a weekend with Chariss. Kaylen had "dry feces in her underwear, and her bottom was raw[.]" On cross-examination, Joshua's mother said she and Joshua's girlfriend took care of the children when Joshua was at work; they "split" taking the children to school as well as picking them up. Joshua's mother acknowledged she would use "[a] swat on the butt" for disciplining the children, and she did "pop" Kaylen in the mouth "[f]or being disrespectful."

Joshua's half-sister lives in Bladen, has been employed with Thermo King and Ingersoll Rand for 22 years, and has been married for 23 years. She testified there were two occasions she heard Chariss say she wished she did not have children and wished she had the "single life" again. Joshua's half-sister said the children would be better off with Joshua "because of the family support" he has, and "[t]here's a lot of stability in our family." She said, "I see Josh becoming the man that he's always meant to be. He's grown a lot in the last year."

Joshua's brother-in-law (married to Joshua's sister) lived in Bladen for about 42 years, and had been "married into the family for 23 years." He testified "the family atmosphere with your parents . . . it's very -- very positive . . . . Very consistent. Very strong family-oriented people. Not perfect by any means. But always there." The brother-in-law opined the children should be placed with Joshua because "there's a lot stronger core family there[,]" and "the opportunities for them will be there." He stated the children had progressed "greatly" in the last 6 months. "Their attitudes. They're so much more involved. They're so much more respectful than they ever have been. And I think with that continuing, I think it's very positive." On cross-examination from Chariss' attorney, he stated Joshua had a stronger core family. The brother-in-law had been around Joshua's family for 23 years, had been in Bladen "40-plus years" and knew a lot of people there, and "[i]t's a very strong community-based family."

A long-time friend of the Jaide family testified. She had known Joshua since he was a child, had done family pictures, Joshua's senior pictures, and his wedding pictures. She agreed that while the children have been in Joshua's temporary custody they seemed happier and healthier, and their "behavior is so much better than what [she] remember[ed] from the past. . . . You can tell they're loved and happy."

A witness who had known Joshua since he was a junior in high school testified that since the parties' separation, the children seemed happier, and if Joshua was awarded custody, he would be "a very good parent." Another witness, employed at Hastings College for 17 years, talked about Joshua's relationship with the children being "[r]eally good," and how she had seen it "blossom in the past year." She described Joshua "always doing things" with the children, how Kaylen is in Girl Scouts and "wants to be a cheerleader like [her] daughter." "And we go over a lot and spend time with [Joshua] and [his] folks. And they're always happy, well dressed, very well mannered. . . . [T]hey're just really great kids, and I've seen [Joshua] do a really good job with them."

Joshua's girlfriend was his final witness. She testified that she and Joshua's mother took care of the children when Joshua worked, but once he got home, Joshua took care of them. She described Joshua's relationship with the children as "very loving," and that the children look up to him and "get excited when [he] come[s] home from work." They are ready to tell him about their day. For discipline, since Hunter is 3, he sits in a chair for 3 minutes, and since Kaylen is six, she sits for 6 minutes. They used to stand at a wall, but Chariss asked to have them sit in a chair, "so that's what we've done." On cross-examination, the girlfriend indicated she and Joshua had been dating for 11 months, but had known each other for 17 years. She is 25 years old and has 4 children (all girls), ranging in age from 18 months to six years. She has custody of her two oldest children, "joint 50/50 custody" with the 3 year old, and the 18-month-old lives with her father. She said her children get along great with Kaylen and Hunter, and her two oldest girls go to the same school as Kaylen.

The decree dissolving the parties' marriage was entered March 13, 2017, and as relevant here, it awarded joint legal custody to the parties, with primary physical custody awarded to Joshua. The district court found both parents to be fit parents, but the "determining factor" was Joshua's family support system was "better than that of [Chariss]." The court noted Joshua had primary physical custody of the children since the temporary order was filed on August 1, 2016, and witnesses testified the children were "well[-]adjusted and doing well in their present placement with [Joshua]." The court indicated it would grant Chariss "extensive parenting time." Chariss was given alternating weekends and holidays, and 8 weeks of summer parenting time. Chariss was ordered to pay $524 per month in child support, and Joshua was ordered to continue carrying health insurance for the children. Chariss timely appealed.

## ASSIGNMENT OF ERROR

Chariss assigns the district court abused its discretion by failing to award her "the primary custody" of the minor children.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Lorenzen v. Lorenzen*, 294 Neb. 204, 883 N.W.2d 292 (2016). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

Child custody and parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. See *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.* A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

The decree awards joint legal custody to both parents, but primary physical custody is awarded to Joshua. Chariss states in her brief that the decree granted Joshua "custody of the parties' minor children" and granted Chariss "visitation with the minor children." Brief for appellant at 1. Her sole assigned error is the district court abused its discretion by failing to award her "the primary custody" of the children. In Chariss' arguments in her brief on the custody issue, there is no discussion related to the award of joint legal custody, so we confine our analysis to whether the district court abused its discretion by awarding physical custody to Joshua rather than Chariss.

When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). The best interests inquiry has its foundation in both statutory and case law. Neb. Rev. Stat. 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude

and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Chariss argues the evidence demonstrated Joshua's mother and his girlfriend "were providing the majority of the care when the children were with" Joshua. Brief for appellant at 11. She claims "the real custody dispute" was between Chariss and Joshua's mother, and therefore, she argues the parental preference doctrine should apply. The parental preference doctrine provides that in the absence of a statutory provision otherwise, in a child custody controversy between a biological or adoptive parent and one who is neither a biological nor an adoptive parent of the child involved in the controversy, a fit biological or adoptive parent has a superior right to custody of the child. *Windham v. Griffin*, 295 Neb. 279, 887 N.W.2d 710 (2016). Joshua's mother was not a party to the divorce proceeding; the custody dispute in the present case was solely between Joshua and Chariss. The parental preference doctrine does not apply here. The fact that Joshua's mother or his girlfriend provided childcare for the children while Joshua worked was a favorable factor, just as it was a favorable factor that when Chariss had to work, the childcare was also provided by familiar people, like her aunt or boyfriend, rather than a daycare facility or lesser known babysitter.

Chariss also suggests the district court abused its discretion by granting custody based on Joshua having a better family support system. While she does not dispute that Joshua "has a family support system in the area," she contends "the record also demonstrated that [Chariss] has a significant family support system, as well." Brief for appellant at 12. She discusses the support received from her aunt, who lives next door, and her father, and that there was "ample evidence to demonstrate that [Chariss] has a support system at least as good as that of [Joshua]." *Id*. This may very well be true, but given our abuse of discretion standard of review, even if we concluded in our de novo review of the record that the family support systems or the parties' respective living environments had fairly equivalent pros and cons, it would not be appropriate for this court to reverse the district court's decision, short of its decision being based upon reasons that were untenable or unreasonable. That was not the case here. Further, in child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *State on behalf of Maddox S. v. Matthew E.*, *supra*.

Finally, Chariss claims the district court failed "to account for the behavior of [Joshua] in reaching its custody determination." Brief for appellant at 12. She claims Joshua prevented her from seeing the children for several months because he was upset over her suggestion that the children attend school in Hastings where Chariss lived and where Joshua worked. She said Joshua denied her contact with the children until a temporary order was put into place. (Joshua testified he wanted Chariss to sign a statement verifying when she would have the children and when she would return them to him.) Further, Chariss points to the incident when Joshua became angry and drove away so fast (with Kaylen in the vehicle) that the vehicle went up on two wheels. She also notes there could be as many as 5 children sleeping in one bedroom at times (in those instances when Joshua's girlfriend might have all 4 of her daughters at the same time), and how Joshua's mother admitted striking Kaylen in the face in the past. Chariss asserts the district court "did not consider these items or did not place sufficient weight on them when making its custody

determination. As a result, it abused its discretion." Brief for appellant at 13. In Joshua's pro se brief, he simply states the district court used its discretion and that the children should remain with him.

In contested custody cases, the trial court's ability to hear and observe the witnesses is of great importance not only in making credibility determinations but also in making necessary findings as to the best interests and welfare of the children. *Davidson v. Davidson*, 245 Neb. 357, 576 N.W.2d 779 (1998) (noting when neither parent is unfit, but neither is ideal, particular weight is given to the fact that the trial court saw and heard the witnesses in making necessary findings as to the best interests and welfare of the children).

As is commonly seen in contested custody cases, each parent seeks to highlight parenting flaws in the other parent to bolster his or her own position as the preferred choice to be awarded custody. In the present matter, while there were aspects of each party's evidence pointing out such flaws in the other parent, there was also favorable evidence for both of them. The evidence favoring each parent demonstrated they both loved their children and had good relationships with them, and both had extended family (and significant others) who were important in supporting their parenting efforts. The district court found both parents to be fit parents, but the "determining factor" was that Joshua had a better family support system than Chariss, and Joshua had primary physical custody of the children since the entry of the temporary order, and witnesses testified the children were well-adjusted and doing well in their present placement with Joshua. Our review of the district court's decision is for an abuse of discretion. And because the evidence in this case was fairly balanced between the parties in terms of favorable and unfavorable factors related to parenting ability and respective environments, we cannot say the district court abused its discretion by deciding the best interests of the children called for placing primary physical custody with Joshua.

## CONCLUSION

Finding no abuse of discretion by the district court, the decree entered on March 13, 2017, is affirmed.

AFFIRMED.