IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

Bhatia v. Thomas-Bhatia

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

Sameer K. Bhatia, appellee,

v.

Kathryn L. Thomas-Bhatia, appellant.

Filed May 11, 2021.    No. A-19-1203.

Appeal from the District Court for Douglas County: Duane C. Dougherty, Judge. Affirmed in part as modified, and in part reversed and remanded with directions.

Justin A. Quinn for appellant.

Adam E. Astley and Jacquelyn E. Warren, of Astley Putnam, P.C., L.L.O., for appellee.

Bishop, Arterburn, and Welch, Judges.

Welch, Judge.

## I. INTRODUCTION

Kathryn L. Thomas-Bhatia appeals the order of the Douglas County District Court dissolving her marriage to Sameer K. Bhatia. Kathryn contends that the district court erred in various respects including the division of the marital estate; determinations of custody, parenting time, and child support regarding the parties' minor children; failing to award her attorney fees and sufficient alimony; and failing to reduce the judgment for direct expenses under the temporary order to an amount certain in the decree. For the reasons set forth herein, we affirm in part as modified, and in part reverse and remand with directions.

- 1 -

## II. STATEMENT OF FACTS

Sameer and Kathryn were married in January 2009. Two children were born during the marriage--Raeva in 2009 and Oren in 2011. In July 2017, Sameer filed a complaint for dissolution of the parties' marriage.

### 1. PRETRIAL TEMPORARY ORDER

In September 2017, the district court issued a temporary order which awarded the parties joint legal and physical custody; ordered Sameer to pay $1,500 in temporary alimony beginning in November 2017; ordered Sameer to pay temporary child support of $1,532 beginning in November 2017; and ordered Sameer to obtain health coverage for the minor children beginning October 2017 with the uninsured medical expenses allocated to Sameer in the amount of 80 percent and to Kathryn 20 percent, subject to the parties exchanging the Explanation of Benefits (EoB) prior to the parties paying their portion of the children's medical expenses. The court's temporary order provided each party the right of first refusal of the children any time the other party was going to be absent from the children longer than 12 hours. Finally, the temporary order allowed the children to remain in their current extracurricular activities with the cost of the activities incurred beginning in October 2017 to be allocated 80 percent to Sameer and 20 percent to Kathryn; however, if the children started new activities, the parties were required to agree to the child's participation in that activity prior to being obligated to pay for the expenses associated therewith.

### 2. TRIAL

The following is a summary of the evidence adduced during the March 2019 trial.

Prior to the parties' marriage, Sameer received a Bachelor's degree in Medicine and a Bachelor's degree in Surgery from a university in India, but was unsuccessful in passing the medical licensing exam in the United States. During the parties' marriage, Sameer completed an MBA program and earned a Master's degree in Science, Business Intelligence, and Analytics. Sameer then worked at various businesses including Prairie Ventures as a managing director; Corporate Ventures doing marketing and sales; and Cerner as a physician executive on the business development team. Kathryn testified that, as part of Sameer's job requirements with Cerner, Sameer traveled up to 60 percent of the time. In June 2009, Sameer started a business called Guru Instruments, LLC, a business entity formed in association with a medical device he invented.

During the parties' marriage, Kathryn pursued an MBA and has maintained employment as a teacher with Omaha Public Schools (OPS). Kathryn also receives approximately $10,000 in annual income from her mother's business, General Media.

After the parties' marriage, they moved into Kathryn's premarital home in Omaha, referred to as the Bedford home. The parties generally testified about property and debts acquired and paid both prior to, and during, the marriage. Specific testimony will be discussed as relevant to the assignment of error associated with the court's property division.

Sameer testified that when both he and Kathryn were at home with the children, they shared equally in caring for their children. In connection therewith, Sameer testified that he was normally responsible for getting the children ready in the morning.

Both parties testified that their relationship was plagued with communication problems. For example, Sameer testified that his children participated in a violin program which provided violins for the children's use and, although the program was scheduled only during his parenting time, Kathryn refused to let Sameer keep the violins at his house. This caused the children to have to wait to begin class until Kathryn brought their violins to them. Sameer testified that Kathryn also held the children's Taekwondo helmets and expensive dance costumes and would not provide them until she arrived at the respective event.

From Sameer's perspective, Kathryn's behaviors were exemplified during the litigation discovery process. Sameer explained that Kathryn would ask for a set of documents and then allege a deficiency that was outside the scope of the original request. Kathryn also requested the same information, three to five times, using different words and then claimed Sameer did not produce the requested documents.

Although Kathryn agreed that the parties had communication problems, she provided a different perspective regarding those problems. She testified that during one argument, Sameer threatened to post photos online that he took of her in various stages of undress without her knowledge. Kathryn further testified that Sameer refused to cooperate with her giving several examples. Kathryn explained that Sameer insisted that coordination of the children's activities and other issues be handled through their attorneys which increased their attorney fees. As another example, Kathryn testified that on Mother's Day, although Sameer offered to provide time for Kathryn to see the children, he rejected her requested time and told her she must accept whatever time worked for him.

Kathryn testified that during discovery, she provided Sameer with a list of items she had removed from the home. Sameer returned the list indicating the value of the items listed had increased to make it appear that the items she took had a higher value and "he wasn't following the garage sale policy." Kathryn testified Sameer had violated the court's temporary order because, rather than offering her the right of first refusal when he was out of town during his parenting time, Sameer allowed his mother to take the parties' children to Kids Club. Kathryn also testified that although the temporary order required Sameer to provide insurance for the children, Sameer failed to provide Kathryn with the insurance cards for approximately 6 months and refused to provide EoB information to her.

Kathryn testified that the temporary order stated the children could continue participating in their current activities and the parties would share the cost of these activities based on the district court's allocation. However, Kathryn explained that after Raeva had finished her dance class and progressed into another class in the same dance activity, Sameer refused to take Raeva to her dance class and refused to pay his share of the associated costs arguing his daughter was participating in a different dance group.

### 3. Dissolution Decree

In September 2019, the district court entered the dissolution decree awarding the parties joint legal and physical custody of the children. After finding that Sameer's monthly income was $18,016 and Kathryn's monthly income was $5,420, the court ordered Sameer to pay monthly child support of $1,035 for both children. The court also ordered the parties to equally divide costs associated with caring for the children, including health care and direct child-related costs, but

ordered that each party pay for all everyday clothing to be used by the children in their households. The court ordered each party to be responsible for the costs associated with the extracurricular activities for which that party signed up the children.

The district court entered a parenting plan which the court found was in the best interests of the children. Among other things, the parenting plan granted each parent essentially the same amount of regular parenting time with the children and set forth the schedule of holidays to be observed. Specifically, Halloween was awarded to Sameer on odd years and Kathryn on even years from 3:30 to 9 p.m. In calculating income and support, the court used worksheet 1 and found Sameer's percentage to be 73.52 percent and Kathryn's to be 26.48 percent, but on worksheet 3, joint physical custody, the court found the parties' percentages to be 50 percent based upon the amount of time each parent had physical custody of the children.

The court's decree also distributed the marital estate in the following manner: (1) Sameer was awarded the marital home, known as Lockwood Lane, valued at $333,000 along with the $288,038 in associated debt; (2) Kathryn was awarded her premarital home, known as the Bedford home, subject to a $15,860 marital equity reduction; (3) both parties were awarded the personal property in their possession due to the court finding both parties' personal property exhibits lacked credibility and that the value of the items in each parties' possession were of almost equivalent value; (4) Kathryn was awarded half of the shares in Sameer's Cerner Employee Stock Plan Account as of September 30, 2017; (5) the court awarded no monetary value to the parties' jewelry because the court did not receive documentary evidence concerning value, but required the parties to hold the jewelry in trust for the children; and (6) the court ordered Sameer to pay Kathryn a property equalization payment of $14,815.50.

Finally, the court ordered Sameer to pay alimony to Kathryn of $1,200 per month for 36 months beginning in October 2019 and ordered that each party was responsible for their own attorney fees finding Kathryn unnecessarily expanded the proceedings, her mother paid her attorney fees, and there was little likelihood that Kathryn would repay her mother.

4. MOTIONS FOR NEW TRIAL

Following the district court's entry of the dissolution decree, both Kathryn and Sameer filed motions for new trial. Kathryn's motion alleged errors regarding the court's allocation of the children's costs and the court's division of property. Sameer's motion alleged that adjustments should be made to his support obligations because, following the completion of the trial, he lost his job with Cerner and was seeking employment.

The district court denied Sameer's motion for new trial in its entirety. The district court denied Kathryn's motion for a new trial but made certain modifications to its previous order restoring Kathryn's maiden name, ordering Kathryn to reimburse the children's account for amounts previously borrowed, awarding Kathryn her premarital retirement accounts from her OPS retirement account and her General Media 401(k), and increasing the amount to be transferred from Sameer's 401(k) account to Kathryn from $22,715.50 to $26,666. Kathryn has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Kathryn's assignments of error, renumbered and restated, are that the district court erred in (1) dividing the marital estate; (2) failing to extend the $1,500 temporary alimony obligation for an additional 60 months; (3) awarding the parties' joint legal custody; (4) failing in its parenting plan to (a) award her summer parenting time during Sameer's work hours, (b) award her a right of first refusal for periods when Sameer is outside the state of Nebraska without the children, and (c) define Halloween as an overnight holiday as the parties requested; (5) failing to divide direct expenses for the children according to their percentage share in the Nebraska Child Support Guidelines; (6) failing to reduce the judgment for direct expenses under the temporary order to an amount certain in the decree; and (7) failing to award her attorney fees.

## IV. STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald, supra*.

In an action involving a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

## V. ANALYSIS

### 1. DIVISION OF MARITAL ESTATE

Kathryn first argues the district court committed multiple errors in connection with the division of the marital estate. Specifically, Kathryn argues that the court erred in (a) determining the debt associated with the Lockwood home, (b) failing to properly allocate the equity associated with the Bedford home, (c) assessing the classification and balance on certain debt obligations, (d) assessing the classification and value of the Wells Fargo account, (e) apportioning certain employee stock, and (f) allocating personal property. We will discuss those assignments below.

(a) Lockwood Home

Kathryn first argues the district court abused its discretion in using a mortgage balance other than the amount agreed upon by the parties in connection with its allocation of the Lockwood home. The court awarded the Lockwood home, which it classified as marital property, to Sameer. In connection with that allocation, the court stated in its order, "The marital home is entirely marital, and the Court valued it using the agreed-upon appraised value of $333,000, minus the debt of $288,038." Kathryn argues that "both parties requested that the court use a mortgage balance for the marital residence as of October 2017 when [Kathryn] moved out, which was $286,718.27. The trial court abused its discretion in finding the mortgage balance was $288,038. And the Decree should be modified to reflect the same." Brief for appellant at 50.

As the Nebraska Supreme Court stated in *Tyma v. Tyma*, 263 Neb. 873, 877, 644 N.W.2d 139, 144 (2002):

> In a divorce action, "[t]he purpose of a property division is to distribute the marital assets equitably between the parties." Neb. Rev. Stat. § 42-365 (Reissue 1998). Equitable property division under § 42-365 is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Gibilisco v. Gibilisco*[, 263 Neb.] 27, 637 N.W.2d 898 (2002). The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000).
>
> The marital estate includes property accumulated and acquired during the marriage through the joint efforts of the parties. *Brunges v. Brunges*, 260 Neb. 660, 619 N.W.2d 456 (2000). The date upon which the marital estate is valued should be rationally related to the property composing the marital estate. *Id.*

In the present case, the district court primarily used data from September and October 2017 in establishing the values for property distribution. That timeframe is consistent with testimony in the record identifying when Sameer and Kathryn separated, which date we find to be rationally related to valuing the property comprising the marital estate and of which we find no abuse of discretion by the district court. See *Brunges v. Brunges*, 260 Neb. 660, 619 N.W.2d 456 (2000).

That said, in making its final property allocation governing the Lockwood mortgage, the district court referenced the Lockwood mortgage statement dated October 2017, but then ascribed a value of $288,038 to the mortgage balance. The mortgage balance from that statement is actually $286,718 and both parties agreed that was the proper balance to use in the property allocation. It appears the court simply entered the wrong number in its order. As such, in order to correct this clerical error, we modify the balance sheet from the decree to reflect the proper mortgage balance in October 2017 as reflected in the mortgage statement which is $286,718. That change results in Sameer's total net assets being $25,122, which requires that we increase Sameer's cash equalization payment obligation to Kathryn to $15,475.50. As to that portion of the decree, we

modify the dissolution to increase Sameer's cash equalization payment to Kathryn from $14,815.50 to $15,475.50.

### (b) Bedford Avenue Home

Kathryn next argues the district court erred in "crediting [Sameer] with all of the payments into the Bedford mortgage without giving any credit for the decrease in equity in the home." Brief for appellant at 47.

The district court classified the Bedford home as Kathryn's premarital property. Kathryn originally acquired the Bedford home prior to the parties' marriage for $132,000 and encumbered the property with a $125,400 mortgage. At trial, the parties testified that, during the marriage, the mortgage was paid down with marital funds leaving a mortgage balance on the valuation date of $109,540. Accordingly, the court found that portion of the debt retired during the marriage paid with marital funds to be marital property and assigned that $15,860 benefit to Kathryn's side of the marital property division ledger.

Kathryn appears to argue that, because the Bedford home was only worth about $109,000 as of the valuation date, that reduction in equity should also be allocated in the property division. But contrary to Kathryn's argument here, the Bedford home was her premarital property which the court properly allocated to her. Because the Bedford home was her premarital property, it was not part of the marital estate to divide and its value is not relevant to the marital property division. Only the portion of the mortgage paid with marital funds was marital property to be allocated and the district court properly allocated that asset as to the appropriate value contained in the record. This portion of Kathryn's assignment fails.

### (c) Debt Obligations

Kathryn makes two separate arguments associated with certain debt obligations. First, she argues that the district court erred in failing to provide a marital credit for paying off Sameer's premarital credit card balance on his Bank of America credit card and his Citi Diamond credit card which she argues was paid with marital funds. Second, she argues the court erred in valuing Sameer's American Express credit card and Nebraska Furniture Mart credit card which were debts incurred during the marriage. We will discuss these matters independently.

Although Kathryn argues the district court erred in failing to find that Sameer's premarital Bank of America credit card and Citi Diamond credit card were paid off with marital funds, the evidence simply does not support that conclusion. Although there is evidence in the form of exhibit 184 which shows credit card balances as of the end of 2008 and early 2009, we find no evidence which speaks to whether these balances were transferred, paid off, or otherwise reduced with marital funds. Further, Kathryn does not direct us to any such evidence which would support this conclusion and does not appear to have even taken this position at the time of trial. Based upon a lack of credible evidence supporting this conclusion, we cannot say the court abused its discretion in not making a marital allocation for the retirement of this particular debt.

Conversely, the court found that Sameer's American Express and Nebraska Furniture Mart credit cards should be classified as marital debt which the court than allocated to Sameer in the division of marital property. As to the proper value of the American Express and Nebraska Furniture Mart credit cards allocated to Sameer in the marital property ledger, the court used credit

card balances from statements provided to the court which were close in time to the property division valuation date discussed previously. Because we found earlier that the valuation date chosen by the court (the date of the parties' separation) was reasonably related to the property being valued in the marital estate, we again find no abuse of discretion in fixing the value of those accounts from those statements. This assignment fails.

### (d) Wells Fargo Accounts

Kathryn next argues the district court erred in finding that Sameer's Wells Fargo account was Sameer's premarital asset. In support thereof, Kathryn simply argues that there was insufficient evidence offered at trial to establish this asset was premarital in origin.

Contrary to Kathryn's argument, Sameer testified he had an account with TD Ameritrade prior to the marriage, that he transferred that account to a Wells Fargo account ending in 8122 during the marriage, and that the only impact on that account that involved marital funds was money he deposited or withdrew from that Wells Fargo account after its creation in the net amount of $480. In support of this testimony, Sameer provided the court with a premarital TD Ameritrade statement and a letter from TD Ameritrade dated March 20, 2018, which represented Sameer transferred the assets from that account in June 2011. Although Sameer could have provided more documentary evidence which filled the gaps associated with the status of this asset over time, we find that the documentary evidence supplied, when considered in connection with Sameer's testimony, was sufficient to establish the Wells Fargo account was an asset created and consisting of the premarital TD Ameritrade account with the exception of the $480 in net deposits or withdrawals made after the account was established. This assignment fails.

### (e) Sameer's Stock Plan

Kathryn next argues the district court erred in its division of Sameer's Cerner Corporation stock without first allocating for a predivorce sale of $6,569.96 of that stock. Kathryn fails to present this court with any evidence associated with this argument. Upon our review, although we found reference in exhibit 47 to a sale of $6,596.96 in Cerner Corporation stock on July 10, 2017, we see no evidence establishing what happened to the proceeds of that stock sale. With no indication in the record of where those proceeds were allocated or whether those proceeds were ultimately spent or divided elsewhere in the marital property allocation, we find no abuse of discretion by the district court in failing to otherwise deal with the predivorce sale in its equitable division here.

### (f) Personal Property

Kathryn next argues the district court erred in its division of the parties' personal property. She contends that the court should have accepted Sameer's personal property valuations which valued Sameer's award of personal property $4,390 higher than her award of personal property.

During trial, both parties produced exhibits in which they listed the personal property taken by each party and assigned values associated thereto. Exhibit 129 was Kathryn's breakdown of the parties' personal property. Exhibit 129 indicated that Sameer had $66,771 worth of personal property in his possession, while Kathryn had $1,239 worth of personal property in her possession.

At trial, Kathryn testified she prepared the list by finding the replacement cost of the items through yard sales, secondhand stores, and online sale postings.

Exhibit 187 was Sameer's breakdown of the parties' personal property. In preparing exhibit 187, Sameer took a copy of exhibit 129 and changed Kathryn's values. Sameer argued that he had $6,189 worth of personal property in his possession while Kathryn had $1,239 worth of property in her possession. Sameer testified that his indications of value represented his opinion of the fair market values for each item in its current condition. For example, Sameer testified that while Kathryn listed the value of Guru Instruments at $5,000 whereas Sameer stated that the entity's holdings were worthless valuing it at approximately $3.

In its order, the district court noted that it had considered exhibits 129 and 187 but found both lacked detail and were based on speculation. The district court concluded that, due to the lack of credible evidence presented by the parties, the personal property in each person's possession was of "equal enough value that no monetary compensation should be ordered." The district court found that neither party presented a credible indication of the value of the personal property divided here. With Sameer and Kathryn having provided no specific articulable basis in valuing the independent items of property, we find no abuse of discretion in the court's finding. Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-half to one-third of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002). We find the district court's personal property division here was reasonable, fair, and did not constitute an abuse of discretion.

### (g) Bicycles

Kathryn also argues the district court failed to include the value of Sameer's bicycles as part of the marital estate. Bicycles are considered personal property. See, Neb. Rev. Stat. § 77-103 (Supp. 2019); Neb. Rev. Stat. § 77-104 (Reissue 2018). As explained in the previous section, the district court awarded each party all household goods and other personal property in their possession, which we found was not in error. Therefore, this assigned error fails.

### 2. ALIMONY

Kathryn next argues the district court erred in reducing her monthly alimony to $1,200 per month and failing to award her 60 months of alimony.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018); *Kelly v. Kelly*, 29 Neb. App. 198, 952 N.W.2d 207 (2020). Additionally, a court should consider the income and earning capacity of each party and the general equities of the situation. *Wiedel v. Wiedel, supra*; *Kelly v. Kelly, supra*. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Wiedel v. Wiedel, supra*; *Kelly v. Kelly, supra*. Alimony is not a tool to equalize the parties' income, but a disparity

of income or potential income might partially justify an alimony award. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015); *Kelly v. Kelly, supra*.

Here, the evidence adduced at trial established that both parties were able to further their education during their 10-year marriage and both parties were employed during the marriage. There was no evidence that Kathryn interrupted her career in order to care for the parties' minor children and was able to pursue an MBA during the marriage. And although there is income disparity between the parties, we cannot say on this record that the amount awarded to Kathryn is untenable such as to deprive her of a substantial right or just result. Based upon these factors, we cannot say that the district court abused its discretion in awarding Kathryn alimony of $1,200 per month.

Kathryn further claims that the court abused its discretion in awarding her alimony for 36 months rather than 60 months. However, as the district court noted in the dissolution decree, Kathryn had already received temporary alimony of $1,500 per month for 24 months. When Kathryn's 36-month alimony award set forth in the dissolution decree is combined with her prior temporary alimony award, Kathryn was awarded alimony for 60 months, which equates with half of the parties' 10-year marriage. Having reviewed the record, this award was equitable, not untenable, and did not deprive Kathryn of a substantial right or just result. This assignment of error fails.

### 3. JOINT LEGAL CUSTODY

Kathryn contends the district court erred in awarding the parties joint legal custody of their children because of the parties' poor communication. Specifically, Kathryn asserts Sameer insulted her constantly during the trial, calling her obsessive, inept, and impaired. Kathryn argues that she was the primary caregiver for the children during the marriage and has continued to schedule appointments for them. Kathryn asserts that the parties had difficulty arranging for removing items from the home, arranging time for the children's birthdays and Mother's Day, and Sameer threatened Kathryn to agree with him or it would cost her $5,000 to $10,000.

"Joint legal custody" is defined as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). Although courts typically do not award joint legal custody when the parties are unable to communicate effectively, a trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests. Neb. Rev. Stat. § 42-364(3) (Cum. Supp. 2020); *State on behalf of Maddox E. v. Matthew E.*, 23 Neb. App. 500, 873 N.W. 2d 208 (2016). For example, in *Kay v. Ludwig*, 12 Neb. App. 868, 686 N.W.2d 619 (2004), this court upheld the trial court's determination of joint legal custody despite the mother's testimony regarding great difficulties in communicating with the father.

Here, although Kathryn argues the district court abused its discretion because both parties testified regarding their poor communication and Sameer exaggerates the truth and insults her, the district court found that both parents were fit and proper to be involved in parenting their children and that joint legal custody was in the children's best interests. Where neither parent can be described as unfit in a legal sense but neither can be described as an ideal parent, we give particular weight to the fact that the trial court saw and heard the witnesses in making necessary findings as

to the best interests and welfare of the children. *Davidson v. Davidson,* 254 Neb. 357, 576 N.W.2d 779 (1998). See, also, *Edwards v. Edwards,* 16 Neb. App. 297, 744 N.W.2d 243 (2008). Giving weight to the fact that the district court heard and observed the witnesses and determined that joint legal custody was in the minor children's best interests despite the parents' testimony regarding their issues concerning communication, and the Nebraska Supreme Court's statements in *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019), which reversed Nebraska's long-standing precedent disfavoring joint custody, we cannot find that the district court abused its discretion in awarding joint legal custody on this record. This assignment of error fails.

### 4. Issues Regarding Parenting Time

Kathryn's assigned errors regarding parenting time are that the district court erred in (a) failing to award her time with the children during the summer every Monday and Tuesday from 8:30 a.m. to 4:05 p.m. during times when Sameer is working and she is not working, (b) failing to award her a right of first refusal, and (c) failing to provide that Halloween be defined as an overnight holiday pursuant to the parties' request.

We have previously explained:

Child custody determinations, and parenting time determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014)[, *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019)].

The trial court has discretion to set a reasonable parenting time schedule. *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016). The determination of reasonableness of a parenting plan is to be made on a case-by-case basis. *Id*. Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. *Id*. The best interests of the children are the primary and paramount considerations in determining and modifying visitation rights. *Id*.

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the following:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016). See, also, *State on behalf of Slingsby v. Slingsby*, 25 Neb. App. 239, 903 N.W.2d 491 (2017).

*Wolter v. Fortuna*, 27 Neb. App. 166, 182, 928 N.W.2d 416, 428-29 (2019). The best interests of the children require that the family remains active and involved in safely parenting with continued quality contact between the children and the family. *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016).

Here, although Kathryn argues that the court's parenting plan would be made better by assigning her parenting time during the summer months, providing her a right of first refusal, and by defining Halloween as an overnight holiday, Sameer makes corresponding arguments which support the district court's current parenting plan and demonstrate a rational basis for the current plan. The district court's dissolution decree adopted a parenting plan that it determined was in the best interests of the children. These findings are subject to the discretion of the district court which will be affirmed absent an abuse of discretion. We find that none of Kathryn's assigned errors concerning the parenting plan amount to an abuse of discretion.

We further note that pursuant to paragraph 10 of the parenting plan:

The parties will celebrate other holidays, birthdays, and significant dates by mutual agreement, consistent with the best interest of the children. The parties may also temporarily adjust the length, timing, or terms of their parenting schedule and/or access to the children by mutual agreement.

If the parties are in agreement governing the matters set forth above, they are free to arrange custody matters which are in the best interests of their children. Absent an agreement, we cannot say the district court abused its discretion in the manner suggested by Kathryn in establishing the parenting plan. This assignment of error fails.

### 5. Children's Direct Expenses

Kathryn argues the district court found the percentage contribution of each parent from the child support guidelines was 26.48 percent for Kathryn and 73.52 percent for Sameer but then ordered the parties to each pay 50 percent of the children's unreimbursed medical expenses, work-related daycare, direct child-related costs, and costs incurred for activities involving the children agreed to by both parties. She argues this was an abuse of the court's discretion.

Neb. Ct. R. § 4-212 provides:

When a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is a rebuttable presumption that support shall be calculated using worksheet 3. When a specific provision for joint physical custody is ordered and one party's parenting time is 109 to 142 days per year, the use of worksheet 3 to calculate support is at the discretion of the court. If child support is determined under this paragraph, all reasonable and necessary direct expenditures made solely for the child(ren) such as clothing and extracurricular activities shall be allocated between the parents, but shall not exceed the proportion of the obligor's parental contributions (worksheet 1, line 6). For purposes of these guidelines, a "day" shall be generally defined as including an overnight period.

In this case, the court ordered joint physical custody with each parent receiving approximately 182 days of custody under the parenting plan. Applying the aforementioned rule,

the court then utilized worksheet 3 to calculate the parent's child support obligation and eventually determined the percentage contribution of each parent was 26.48 percent for Kathryn and 73.52 percent for Sameer.

Having determined the child support obligation, the court then turned to the issue of the allocation of all reasonable and necessary direct expenditures as contemplated by rule 4-212. That rule provides that the district court has discretion to allocate direct expenses between the parties "not [to] exceed the proportion of the obligor's parental contributions (worksheet 1, line 6)." Neb. Ct. R. § 4-212. "Obligor" is defined under the Income Withholding for Child Support Act as "a person who owes a duty of support pursuant to a support order." Neb. Rev. Stat. § 43-1714 (Reissue 2016).

In the instant case, Sameer, as the party who was ordered to pay child support to Kathryn, was the "obligor." His contribution percentage set forth in worksheet 1, line 6, was 73.52 percent. By rule, Sameer could not be ordered to pay more than 73.52 percent of the reasonable and necessary direct expenditures made solely for the children. To the extent that Kathryn is arguing the court was required to allocate direct expenses in accordance with Sameer's percentage contribution in worksheet 1, line 6, we disagree. That allocation is made at the discretion of the court not to exceed the percentage contribution set forth in worksheet 1, line 6. The question thus becomes whether the court abused its discretion here in ordering that Sameer only pay 50 percent of such expenditures rather than the 73.52 percent otherwise required for his child support obligation. Under the facts of this record, we find the court did abuse its discretion here.

As demonstrated on worksheets 1 and 3, there is a significant income disparity between Sameer and Kathryn. Sameer's total monthly income is shown at $18,016 while Kathryn's is shown to be $5,420. Additionally, there was evidence in the record where each party accused the other of unnecessarily incurring excessive expenses in connection with extracurricular activities and, under such circumstances, it is not unreasonable to allocate some of the "direct child-related costs" on a basis different than the child support obligation percentage to avoid conflicts between the parties. That said, the court applied the 50/50 allocation not only to certain extra-curricular activities, but also to costs associated with the children's unreimbursed medical expenses and work-related daycare. As to those expenses, based upon the disparity in the parties' incomes here, we find it an abuse of discretion to allocate cost-sharing 50/50 rather than in accordance with the regular child support allocation percentage. As to these expenses, the dissent states that "[g]iven the high conflict between the parties in this case . . . . it is understandable that the district court sought to avoid giving Kathryn the leverage to potentially incur expenses more readily if Sameer was required to pay a higher percentage than Kathryn." The dissent then uses that justification to support the district court's order allocating the sharing of all such direct expenses evenly. And although we agree with that justification as it relates to expenses such as extracurricular activities, we do not agree a similar justification applies in relation to medical expenses and day care expenses which do not lend themselves to leveraging. On this record, we believe that in applying the child support guidelines, it was an abuse of discretion to require an equal allocation of such expenses. Accordingly as to section 21 of the decree, we modify the decree to provide that as to "all reasonable and necessary unreimbursed children's health care costs and work-related daycare," the parties shall divide such expenses 73.52 to Sameer and 26.48 to Kathryn. We affirm the remainder of section 21 of the decree without modification.

Kathryn next assigns that the district court erred "[i]n failing to reduce the judgment for direct expenses under the Temporary Order to an amount certain in the Decree." Brief for appellant at 7. In connection with that assignment, Kathryn argues:

> The Decree was silent with regards [sic] to expenses, which should have preserved them, but the trial judge made a pronouncement at the motion for new trial that cast doubt on that preservation without reducing that pronouncement to an order. [T]he expenses were overwhelming[ly] uncontested, the trial judge simply chose not to reduce them to an amount certain in the Decree.

Brief for appellant at 32. Kathryn argues in the alternative that the district court abused its discretion by not including in its decree an order requiring Sameer to reimburse Kathryn for his share of those expenses which she fronted during the pendency of the temporary order.

At trial, Kathryn sought reimbursement for certain medical expenses, extracurricular activities, and for cell phone expenses allegedly paid by her but not reimbursed by Sameer prior to trial. Specifically, Kathryn claimed at trial that Sameer should be responsible for $3,975.55 in expenses (80 percent of $4,969.71) which she itemized in Exhibit 123 with attached receipts and which she testified were incurred and paid by her on behalf of the children between August 29, 2017, and October 1, 2018. She additionally sought reimbursement for dance lessons in the amount of $2,027.71 (80 percent of $2,534.64) which were itemized in exhibit 105 and which she testified were incurred and paid during the same period. Kathryn separately sought reimbursement for $3,035.15 in cellular phone bills for the children which she testified she also paid during the same period. Sameer similarly argued at trial that Kathryn failed to reimburse him for expenditures he made for direct expenses during the same time period.

First, we note that the temporary order did not provide for reimbursement for cellular phone expenditures for the children. Consequently, Sameer was not responsible for reimbursing Kathryn for these expenditures even during the pendency of the temporary order. Kathryn's argument about cellular phone bill reimbursements fails.

Regarding the children's unreimbursed medical and extracurricular expenses, the temporary order provided that uninsured medical expenses incurred for the children would be allocated with Sameer paying 80 percent and Kathryn paying 20 percent, conditioned on the parties exchanging the EoB before submitting their portion of the cost to the party responsible for paying the medical care. The temporary order also provided that the children shall remain in all extracurricular activities in which they currently participated with the parties splitting the cost with Sameer paying 80 percent and Kathryn paying 20 percent, but that new activities must be agreed upon prior to either party being obligated to share the cost. Kathryn argued at trial that she fronted costs associated with uninsured medical expenses and qualifying extracurricular activities but has not been reimbursed by Sameer in accordance with this allocation. She provided no evidence that she presented these costs to Sameer for reimbursement prior to trial and appears to have presented these claims for reimbursement for the first time at trial.

When the district court first entered its decree following trial, the decree failed to address the issue of reimbursement of these expenses allegedly incurred during the period of time governed

by the temporary order. As a result, Kathryn filed a motion for a new trial requesting that the district court address the issue and "preserve the Temporary Orders regarding expenses." During the hearing on that motion, the court orally ruled:

> I'm going to deny preservation of [the] temporary judgment order. I'm going to deny any of the -- I guess if you call them consumer debts or the 4,000 and 3,000 and the other moneys that each of them think they had coming to each other because they paid these expenses while this matter was pending. I went all -- over those . . . and there [were] disagreements. I had nothing . . . of certainty that I could find appropriately, so I left them out of the balancing sheet in that respect. They were intentionally left out.

As to that ruling, Kathryn directs this court to *Dartmann v. Dartmann*, 14 Neb. App. 864, 717 N.W.2d 519 (2006). In *Dartman*, this court considered a father's claim that because a dissolution decree did not specifically preserve accrued temporary child support, those arrearages were effectively terminated. In rejecting the father's claim, we looked to Neb. Rev. Stat. § 42-369(4) (Reissue 2004) which, at that time, provided, in part, that "'[o]rders, decrees, and judgments for temporary or permanent support or alimony . . . have the force and effect of judgments when entered.'" *Dartmann*, 14 Neb. App. at 866, 717 N.W.2d at 521. (We note that although § 42-369 has been amended since *Dartmann*, the aforementioned language remains unchanged in the most current amended version of the statute found in Cum. Supp. 2020). We then explained that because temporary child support is a vested right once it accrues, a district court can discharge an arrearage of temporary child support only if there is satisfactory proof that the judgment has been fully paid or satisfied by the act of both parties.

In support of her specific assignment, Kathryn first argues:

> In the present case, the Decree was silent as to what had happened with regards [sic] to division of the direct expenses for the children, which were a part of the Temporary Support Order, those amounts were preserved automatically under the law set forth in *Dartmann*. The appellate court should find that the trial court's utterance at the hearing on the Motion for Temporary Order has no effect on the preservation of the amount due and that the division of expenses from the temporary order are preserved.

Brief for appellant at 42-43. Kathryn separately argues that, having presented her claim at trial for reimbursement of these expenses incurred, the district court abused its discretion in failing to include in its decree an order obligating Sameer to reimburse her. We will address the abuse of discretion argument first because we find it dispositive of this issue.

The record is clear that in its temporary order, the district court required Sameer to pay 80 percent of certain medical costs and certain qualifying extracurricular activities of the children. The record is equally clear that during trial, Kathryn presented testimony and receipts claiming she fronted numerous medical and extracurricular activity expenses for the parties' children during the period of time covered by the temporary order and was entitled to an order requiring Sameer to reimburse her. Most notably, at trial, Kathryn offered exhibit 123, which itemized these expenditures and included receipts associated with most of the expenses, while relying on exhibit 105 and her testimony in relation to the children's dance classes.

During trial, Sameer neither objected to this evidence nor offered any specific evidence that we could find where he disputed the authenticity, amount, or character of these items on those exhibits as related to Kathryn's right to reimbursement. Instead, in his appellate brief, Sameer simply argues:

> Kathryn didn't testify that she sought reimbursement of the items on Exhibit 123 at any time prior to trial. She offered no emails from herself to [Sameer] seeking reimbursement, and when asked about that by her counsel, she actually testified "it was just -- we were going to deal with it at trial."
>
> In effect, what Kathryn seeks from this Court is a determination that any litigant can just hold 18 months of expenses, never seek reimbursement, raise the issue at trial and *the trial court will have abused its discretion if it does not reduce those expenses to judgment.* That cannot be the case.

Brief for appellee at 28. (Emphasis in original.) (Citations omitted.)

We disagree with Sameer's argument on this record. Here, although the court's temporary order required Sameer to pay 80 percent of certain medical costs and extracurricular activities of the children, the court did not set forth a reimbursement procedure to follow in connection with seeking reimbursement for those expenses. Although we do not find it to be best practice to wait until the time of trial to pursue a claim of this nature, based upon the language of the temporary order which did not provide a specific time frame or procedure associated with seeking reimbursement of such expenses, we hold it was not improper for Kathryn to pursue her claim for reimbursement under the temporary order at the time of trial.

Once Kathryn decided to pursue a claim for reimbursement of these expenses she claimed were due under the temporary order, Sameer was in a position to offer evidence or otherwise refute her claim of right to reimbursement. Here, Sameer did neither. As to the itemized expenditures in exhibits 123 and 105, Sameer offered no specific evidence which refuted that Kathryn incurred these expenses during the period of the temporary order, that they were not qualifying expenses under that order, or that she was otherwise not entitled to be reimbursed for them. And although certain of the line items provide somewhat vague descriptions such as "kids clothes" or "Dick's Sporting Goods," which may fit within the ambit of reimbursable extracurricular activities under the temporary order, there are numerous items such as doctor or dentist visits which appear to clearly be reimbursable items under the temporary order, and because we can find no specific evidence from Sameer which refuted these items, or her right to reimbursement of them, we hold the court abused its discretion in finding Kathryn was not entitled to reimbursement of the claimed expenditures. As to these expenditures, the dissent gives considerable weight to the court's statement made during the hearing on motion for new trial regarding Kathryn's claim for reimbursement. After having failed to address Kathryn's claim for reimbursement at all in the decree, the court during the hearing stated it did not allow the expenditures because there were "disagreements" as to those amounts and the court "had nothing . . . of certainty that [it] could find appropriately, so [it] left them out of the balancing sheet in that respect." But Kathryn's burden of proof governing the court's prior order requiring Sameer to reimburse Kathryn for qualifying expenditures was not one involving certainty. She was required to satisfy a burden by a preponderance of the evidence. In furtherance of that burden, she offered descriptions of

expenditures with receipts and testimony that these expenses qualified for reimbursement. Those expenditures included certain medical costs and dance lessons which were the kinds of expenses the court anticipated would be incurred when it fashioned the temporary order. And although there was testimony at trial governing the parties' vague accusations of running up costs in general, there was no such evidence presented to contradict Kathryn's testimony and exhibits regarding specific requests for reimbursement of the expenses she incurred and for which she provided detailed receipts. We believe it to be an abuse of discretion to categorically deny all of these expenses without a precise challenge to any of these specific expenses Kathryn stated she incurred. Consequently, we find that the district court abused its discretion in flatly rejecting these expenses. We therefore remand to the district court to enter an order requiring Sameer to reimburse Kathryn the sum of $6,003.26 for reimbursable expenses she incurred during the pendency of the temporary order.

Because we find the court erred in denying Kathryn's request for reimbursement of qualifying expenses under the temporary order, we need not address Kathryn's second argument that these expenses could not be discharged in the manner articulated by the court from the bench during Kathryn's motion for new trial hearing. See *Seldin v. Estate of Silverman*, 305 Neb. 185, 939 N.W.2d 768 (2020) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

## 7. ATTORNEY FEES

Kathryn's final argument is that the district court erred in failing to award her attorney fees arguing that because Sameer is in a superior financial position, equity requires that he pay a portion of her attorney fees.

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019). In dissolution cases, as a matter of custom, attorney fees and costs are awarded to prevailing parties. *Id.* In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id.*

Here, Kathryn's attorney fee affidavit shows that Kathryn paid her attorney $112,639.70. In its decree, the district court ordered each party to pay their own attorney fees finding Kathryn unnecessarily expanded the proceedings and that her mother paid her attorney fees, for which Kathryn will likely not reimburse her mother. However, we note the issues in this case were not particularly novel or difficult, each party prevailed on some issues and was unsuccessful on others, and the nature of the case and findings do not otherwise necessarily militate in favor of an award for attorney fees here. We conclude the district court did not abuse its discretion in failing to award Kathryn attorney fees. This assigned error fails.

## VI. CONCLUSION

For the reasons set forth herein, we modify the dissolution decree to reflect that Sameer's cash equalization payment to Kathryn is increased from $14,815.50 to $15,475.50 and to reflect

- 17 -

that Sameer is responsible for 73.52 percent and Kathryn is responsible for 26.48 percent of the children's unreimbursed medical expenses and work-related daycare. We further reverse the court's denial of Kathryn's request for reimbursement of qualifying expenses under the temporary order and remand for the district court to enter an order requiring Sameer to reimburse Kathryn in the amount of $6,003.26 for those qualifying expenses due under the temporary order which she fronted on Sameer's behalf. We affirm the remainder of the dissolution decree.

AFFIRMED IN PART AS MODIFIED, AND IN PART
REVERSED AND REMANDED WITH DIRECTIONS.

BISHOP, Judge, concurring in part, and in part dissenting.

Although I largely concur with the majority opinion, I disagree with its modification and reversal of the decree on two matters. One relates to its modification of the district court's decision apportioning the children's medical and daycare expenses equally between the parties. The other relates to its reversal of the district court's decision denying Kathryn's request for reimbursement of certain expenditures under the temporary order. As to both matters, the majority concluded the district court abused its discretion. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Higgins v. Currier*, 307 Neb. 748, 950 N.W.2d 631 (2020). I cannot agree that the district court's decision as to these two matters rose to the level of an abuse of discretion. As an appellate court, we may disagree with certain decisions made by a trial court, but with an abuse of discretion standard of review, we should affirm a trial court's discretional rulings absent a clear deprivation of a litigant's substantial right. This is especially important in cases like the one before us, where high levels of conflict exist between the parties that are best witnessed and considered by the trial court as testimony unfolds in the courtroom. High conflict domestic cases challenge the district court to find ways to minimize that conflict when crafting a final decree. I agree with Sameer that the district court "did exactly that here," brief for appellee at 27, when deciding cost-sharing matters in this case.

First, regarding medical and daycare expenses, the majority concluded that the district court abused its discretion by ordering a 50/50 sharing of medical and daycare expenses instead of ordering each parent's respective percent share of the child support obligation as indicated on worksheet 1, line 6 (or worksheet 3, line 1) of the parties' child support calculation. In this case, Sameer's share is 73.52 percent and Kathryn's share is 26.48 percent.

Notably, no statute nor any rule requires that the sharing of these expenses must be set according to each parent's respective percent share of the child support obligation. To the contrary, the rules applicable here all make this a discretionary decision for the trial court. The only requirement in allocating these expenses is that the amount allocated to the parent paying child support (obligor) shall not exceed his or her respective percent share of the child support obligation. As recognized by the majority, Sameer could not be ordered to pay more than 73.52 percent of such expenses.

As pertinent here, Neb. Ct. R. § 4-212 (rev. 2011) directs that when joint physical custody is ordered and worksheet 3 is used to calculate child support, then "all reasonable and necessary direct expenditures made solely for the child(ren) such as clothing and extracurricular activities shall be allocated between the parents, but shall not exceed the proportion of the obligor's parental

- 18 -

contributions (worksheet 1, line 6)." Additionally, Neb. Ct. R. § 4-215 (rev. 2020) places the same limitation on health insurance and nonreimbursed health care expenses for children. Section 4-215(B) states that "[a]ll nonreimbursed reasonable and necessary children's health care costs in excess of $250 per year shall be allocated to the obligor parent as determined by the court, but shall not exceed the proportion of the obligor's parental contribution (worksheet 1, line 6)." Likewise, Neb. Ct. R. § 4-214 (rev. 2016) provides the same discretion and limitation for childcare expenses. Section 4-214 states that childcare expenses "shall be allocated to the obligor parent as determined by the court, but shall not exceed the proportion of the obligor's parental contribution (worksheet 1, line 6) and shall be added to the basic support obligation computed under these guidelines." Based on the plain language of the rules, it is discretionary to the trial court whether to maximize the obligor's share of the expenses or require something less.

Given the high conflict between the parties in this case and the constant disagreement about cost-sharing matters, it is understandable that the district court sought to avoid giving Kathryn the leverage to potentially incur expenses more readily if Sameer was required to pay a higher percentage than Kathryn. The majority acknowledged this fact in finding no abuse of discretion in the district court ordering a 50/50 sharing of extracurricular expenses. However, the majority concluded differently as to the 50/50 sharing of medical and daycare expenses. It reached this decision based solely "upon the disparity in the parties' incomes." Because of this income disparity alone, the majority found it was "an abuse of discretion to allocate cost-sharing 50/50 rather than in accordance with the regular child support allocation percentage." Although the majority correctly disagreed with Kathryn's contention that the district court was required to allocate direct expenses in accordance with Sameer's percentage contribution, the majority nevertheless concluded that the district court abused its discretion by ordering Sameer to pay only 50 percent of such expenditures rather than 73.52 percent.

In my opinion, determining the amount of contribution to be paid by each parent for such expenditures should be left to the discretion of the trial court, and I am unaware of any precedent that would suggest that a disparity in income alone deprives the trial court of that discretion. Nor am I aware of any precedent that would suggest that using a 50/50 sharing of such costs to equalize power and control issues between high-conflict litigants constitutes an abuse of discretion. Notably, Kathryn's counsel raised the issue of income disparity as to this very issue at the hearing on her motion for new trial. The district court was not persuaded, and given its advantage in assessing the evidence, we should defer to its decision.

My second point of disagreement relates to the temporary order entered September 25, 2017, and the district court's denial of Kathryn's request for reimbursement of certain expenses from Sameer under that order. Again, given our standard of review, I disagree with the majority's finding that the district court abused its discretion by denying Kathryn's request.

In the temporary order, Sameer was ordered to pay $1,532 in child support per month and $1,500 in alimony per month, and he was directed to maintain health insurance coverage for the children. Sameer was also ordered to pay 80 percent of reasonable and necessary uninsured medical expenses for the children, with Kathryn ordered to pay 20 percent. They were each responsible for paying daycare costs incurred during their own parenting time. The children could remain in all extracurricular activities "that they [were] currently involved in" and Sameer was to pay 80 percent of the "costs of these activities" commencing with "activity costs" incurred on or

after October 1, 2017. Any new activity had to be agreed upon in advance by the parties before either party would be obligated to share the expense.

From October 2017 until trial in March 2019, it is undisputed that Kathryn did not submit to Sameer any request for his 80-percent reimbursement of uninsured medical expenses or costs of extracurricular activities paid for by Kathryn. Instead, at trial, Kathryn submitted exhibits, with minimal testimony, in support of her claim for reimbursement. I agree with the majority that while it is not the best practice to wait until trial to pursue amounts that may be due under a temporary order, it is not improper to do so. However, I disagree that the district court abused its discretion by electing not to award Kathryn the amounts she claimed were owed to her.

The majority concluded that since Sameer did not specifically challenge Kathryn's right to reimbursement for expenses she claimed to have paid under the temporary order, as set forth in exhibits 105 and 123, then the district court abused its discretion in finding Kathryn was not entitled to reimbursement for the items she claimed. I disagree with this assessment. As the majority observed, the decree was silent on this issue, and it was therefore raised by Kathryn in her postjudgment motion for new trial. During the hearing on that motion, the district court specifically denied Kathryn's request, noting that each party claimed amounts due from the other. The court stated it had gone "over those" and that there were "disagreements" as to those amounts. The court "had nothing . . . of certainty that [it] could find appropriately, so [it] left them out of the balancing sheet in that respect." Further, the court made it clear that "[t]hey were intentionally left out."

The district court's assessment of the evidence was appropriate, namely, that the evidence lacked enough certainty to award either Kathryn or Sameer reimbursement under the temporary order. For example, exhibit 105 consists of 127 pages of notes, emails, text messages, calendars, and dance statements, including statements dating back to 2015-16, which clearly predates the September 2017 temporary order. There is no cover page describing which of the amounts reflected in the various documents contained in this 127-page exhibit qualify for reimbursement. In her brief, Kathryn claims she is entitled to be reimbursed by Sameer for his 80-percent share of $2,134.15 for dance lessons, or $1,707.32. On the other hand, the majority awards Kathryn reimbursement for 80 percent of $2,534.64, or $2,027.71. The only testimony from Kathryn regarding reimbursement for dance costs is when she responds to her counsel's question about being reimbursed for 80 percent of "$319 a month from . . . November of 2018 to July." Exhibit 105 reflects monthly dance class charges of $316.83 during that timeframe, so it appears the majority multiplied that amount times the 8 months referenced in Kathryn's testimony. However, the majority does not address the fact that the district court may have taken into consideration that there was a conflict between the parties regarding whether this particular term and/or level of dance classes qualified as an activity that the children were "currently involved in" at the time of the September 2017 temporary order. Because of that conflict, along with the lack of specificity as to what amounts Kathryn was actually seeking, I do not see how we can say that the district court abused its discretion by denying these expenditures.

Also, exhibit 123 contains 47 pages, 2 pages of which list numerous expenditures with vague references, such as, "kids clothes," "shoes & clothes," "clothing," "towels, bath items," "Towels, washcloths, etc.," "Dick's Sporting Goods," "Gymboree -- kids clothes," "sporting goods," and "Old Navy -- kids clothing." Only two medically-related items are contained on the

list, one for "doctor" in the amount of $38.11, and one for "dentist -- kids" in the amount of $147.20. There are some references to activities, such as, "dance," "dance item," "tap shoes," "Art camp," and "Soccer camp." The total amount reflected in the itemization is $4,969.71, followed by "**<u>Sam owes 80%</u>**" (emphasis in original), which is shown to be $3,975.77. The rest of the exhibit's pages contain photocopies of receipts, shipment confirmations, and some statements. Although it is true that Sameer did not object to the court's receipt of exhibit 123, it is also true that Kathryn offered no testimony to explain how the vague references to these items actually qualified the items as "activity costs" that the children were "currently involved in" under the temporary order. It was certainly within the district court's discretion to conclude the evidence was insufficient or unpersuasive to make a fair determination about whether the expenditures presented by Kathryn qualified for reimbursement as "activity costs" under the temporary order. And as for the "doctor" and "dentist -- kids" amounts totaling $185.31, this amount was less than the 20-perecent reimbursement Sameer sought from Kathryn for medical costs he had paid under the temporary order; therefore, declining to direct reimbursement for medical costs to either party was not an abuse of discretion.

In summary, regarding amounts due under the temporary order, the fact that Sameer did not object to, nor cross-examine with respect to, exhibits 105 and 123 does not prohibit the district court from rejecting such evidence. Triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. *Id*. Clearly, it was within the district court's discretion to decline Kathryn's request for reimbursement for the noted expenditures given the lack of specific or otherwise credible evidence properly qualifying them as reimbursable items under the temporary order. And as for the nominal unreimbursed medical costs itemized on exhibit 123, it was certainly within the court's discretion to balance Kathryn's payment of those costs against Sameer's payment of equivalent or greater unreimbursed medical costs.

Finding no abuse of discretion by the district court in deciding these two matters, I dissent as to the majority's decisions regarding the same. As to the rest of the opinion, I concur.